**BASS PLATING COMPANY**

v.

**TOWN OF WINDSOR.**

**Civ. No. H-83-465(AHN).**

United States District Court,
D. Connecticut.

April 23, 1986.

Dennis C. Cavanaugh, Cohen & Channin, Hartford, Conn., for plaintiff.

Andrew G. Messina, Jr., O'Malley, Deneen, Messina, and Oswecki, Windsor, Conn., for defendant.

## MEMORANDUM OF DECISION

NEVAS, District Judge.

This is a civil action brought under 42 U.S.C. Section 1983. The plaintiff alleges that actions of the defendant violated its rights under the due process and equal protection clauses of the fourteenth amendment to the United States Constitution. The plaintiff claims that the rules, regulations and procedures of the defendant's Air and Water Pollution Abatement Commission concerning the disposal of metal hydroxide waste in its landfill were arbitrary, discriminatory and impermissibly vague. Jurisdiction is based on 28 U.S.C. Section 1343. The action was tried to the court. Based on the credible testimony and other evidence presented, the court finds the following facts:

### *Findings of Fact*

1. Bass Plating Company ("Bass") is a metal plating business located in the Town of Bloomfield, Connecticut. As a by-product of its plating process it generates metal hydroxide waste in sludge form. Stip. para. 1

2. On or about June 13, 1972, the Town of Windsor and the Town of Bloomfield entered into an agreement to develop and operate a sanitary landfill in the Town of Windsor ("landfill") for waste disposal from the residents and businesses of each town. Stip. para. 6.

3. The Town of Windsor has sole ownership, control and supervision of the landfill. Stip. para. 7.

4. Prior to September 18, 1974, the Town of Windsor established and designated an agency known as the Air and Water Pollution Abatement Commission ("AWPAC") which consisted and still consists of persons who are agents of the Town of Windsor. Stip. para. 9.

5. From 1974 to 1983 Charles Petrillo was the Environmental Health Officer for the Town of Windsor and an ex-officio member of AWPAC. Petrillo was responsible for enforcing AWPAC requirements for depositing metal hydroxide waste in the landfill. Tr. 329–330, 648.

6. At all times material hereto AWPAC reviewed and recommended for acceptance or rejection, petitions from Windsor and Bloomfield industrial firms to deposit industrial waste in the Windsor landfill under authority delegated by the State of Connecticut to the Town of Windsor with respect to the regulation of the placement, removal and/or disposal of solid waste under Conn.Gen.Stat. Sections 7–148 *et seq.* and 7–194(14) *et seq.* Stip. para. 10.

7. During the period 1975 to 1982, the "Procedures for Accepting Industrial Waste in the Landfill" were the published guidelines used by the defendant to govern the disposal of industrial waste in the landfill. Stip. para. 13; Ex. 42.

8. The "Procedures for Accepting Industrial Waste in the Landfill" makes no reference to the percentage of water content that was acceptable in the waste. Stip. para. 14.

9. There are no other written AWPAC guidelines used by the defendant to govern the disposal of industrial waste in the landfill. Stip. para. 15; Ex. 42.

10. One of the procedures contained in the aforesaid guidelines was the submission of findings to the Connecticut Department of Environmental Protection ("DEP") for review, comment and approval. Stip. para. 17; Ex. 42.

11. In 1974 and 1975 the Town of Windsor did not require the laboratory analysis of metal hydroxide waste to include the percentage of water. Tr. 381.

12. In 1976 AWPAC imposed a requirement that metal hydroxide waste deposited in the landfill contain 50% or less water. *Id.*

13. Shortly before July 20, 1976, the plaintiff filed a request with AWPAC to deposit 1,500 tons of metal hydroxide waste in the landfill. Tr. 29–30.

14. AWPAC denied the plaintiff's request since there was insufficient information concerning the composition of the waste. AWPAC required the plaintiff to

submit a laboratory analysis indicating the constituents of the waste, the percentage or concentration of each constituent, the pH content and the percent of water or other liquid. Ex. 2.

15. The subsequent laboratory analysis of the plaintiff's waste indicated a water content of 71.4%. Tr. 34–38; Ex. 3.

16. On September 10, 1976, the defendant notified the plaintiff that the waste would have to be dried to a 50% water content before it would be acceptable for disposal in the landfill. The plaintiff was informed that, following submission of a laboratory analysis indicating a 50% water content, the Town would accept 60–65 tons on a trial basis. If the quality of the underground aquifer was not affected and if the water content remained at 50% or less then it could expect to deposit 60–65 tons every 3–4 months. Tr. 39–42; Ex. 4.

17. Beginning in 1977 DEP approval was required before metal hydroxide waste could be deposited in the landfill. Tr. 381

18. The DEP advised AWPAC that a 70% water content standard would provide sufficient protection against infiltration of leachate into the ground water supply. Ex. 5, 6.

19. Despite the plaintiff's attempts and the attempts of the DEP to persuade AWPAC that the 50% water content requirement was unnecessary, unworkable and unrelated to their objectives, AWPAC continued to insist on 50% or less water content. Tr. 43–46, Ex. 5, 6.

20. At the time the plaintiff sought approval to deposit metal hydroxide waste in the landfill it had received approval from the DEP. Tr. 435.

21. In 1976, the plaintiff, in an attempt to reduce the percentage of water content of its waste to 50% or less, hired a company to remove the waste from the lagoon where it was stored and mix it with sand. This procedure would not reduce the volume of water but, by increasing the solids, would reduce the percentage of water. Tr. 49–50.

22. After mixing the waste with sand, the plaintiff, from 1976 to 1981, made numerous attempts to contact Mr. Petrillo to obtain his approval to deposit the waste in the landfill. Tr. 107–108, 109.

23. The plaintiff was unsuccessful in its attempts to contact Mr. Petrillo. As a result, the waste remained on the plaintiff's property until 1981. Tr. 49–50.

24. When the plaintiff contacted AWPAC in the summer of 1980 for authorization to deposit the metal hydroxide waste in the landfill it was advised that it would have to come before AWPAC, submit a laboratory analysis of the waste and that the waste would have to have a 50% water content even though it was then reported to have a jelly-like consistency. Tr. 345; Ex. A–22.

25. In September, 1981 AWPAC reviewed the plaintiff's request to deposit waste in the landfill. The plaintiff was again informed that it would have to achieve 50% water content in order to deposit its waste in the landfill. Ex. 25.

26. In 1981, the defendant made a visual inspection of the plaintiff's hydroxide waste that had been removed from the lagoon in 1976 and mixed with sand and gave its approval to deposit it in the landfill. The laboratory analysis which the plaintiff was required to submit prior to obtaining this approval indicated a water content of 13.1%. Tr. 353–56, 421–424; Ex. 7, 46.

27. The waste deposited by Bass at the landfill in 1981 looked like sand. Tr. 320.

28. In the case of metal hydroxide sludge a precise measure of the percentage of water in contrast to solids cannot be made by human visual inspection. Stip. para. 16.

29. By September 1981, the town had imposed a $20.00 per ton charge for special waste deposit. This charge was initiated in February, 1981 and was not in effect between the years 1976–1980. Stip. para. 8; Tr. 57–58; Ex. 7.

30. The plaintiff paid $29,243.87 in special waste charges to the defendant to de-

posit its 1,517.86 tons of hydroxide waste in the landfill. Tr. 62–64; Ex. 8.

31. The total amount paid to the town to deposit the hydroxide waste including the charges imposed for late payment of the special waste fee was $30,752.87. Tr. 65.

32. The plaintiff borrowed $30,000 to pay this fee. The interest on this borrowed money was $2,067.02. Tr. 66.

33. During the period 1976 to 1983 the plaintiff continued to produce and accumulate metal hydroxide waste which it stored in lagoons on its premises. Tr. 87–90, 137.

34. The plaintiff did not apply to AWPAC for permission to deposit this additional waste in the landfill. Tr. 137.

35. In 1982 or 1983 the plaintiff transported this additional metal hydroxide waste by truck to New York for disposal. Tr. 86.

36. Some of the waste that was transported to New York was generated after the imposition of the special waste charge in 1981. Tr. 148, 169–171, 178–79.

37. The exact amount of waste generated prior to the imposition of the special waste charge is uncertain. It was estimated to be approximately 25%. Tr. 148, 167–171.

38. The charges for trucking this waste to New York totalled $21,804.05. Tr. 91, Ex. 35.

39. The plaintiff transported the waste to New York rather than attempt to deposit it in the landfill because the charge for special waste had increased to $125 per ton. Tr. 92.

40. During the period 1974 to 1982 only three local manufacturing companies applied to AWPAC for approval to dispose of metal hydroxide waste in the landfill. Tr. 359; Stip. para. 19.

41. Stanadyne Diesel Systems, Inc. ("Stanadyne") is a Windsor, Connecticut company which manufactures diesel injection equipment. It generates metal hydroxide waste in sludge form as part of its manufacturing operations. Tr. 190–192.

42. The laboratory analysis submitted by Stanadyne to AWPAC in connection with its application to dispose of its waste indicated a water content of 80%. Tr. 193–94, 197, 212; Ex. 17.

43. AWPAC informed Stanadyne that it would have to mix its waste with sand to reduce the water content to 50%.

44. Stanadyne mixed the waste with sand but was not required to submit a new laboratory analysis showing the water content of the mixture. Tr. 201–202.

45. Stanadyne deposited 1,193.03 tons of hydroxide waste in the Windsor landfill between November, 1980 and April, 1981. Approval for this disposal was given after visual inspection by the Environmental Health Officer. Tr. 225; Ex. 16.

46. The consistency of the waste deposited by Stanadyne varied from truckload to truckload. Some truckloads were initially rejected for being too wet but were subsequently accepted. Tr. 208–210, 227.

47. In November, 1980 a truckload of Stanadyne's waste was rejected on visual inspection at the landfill. This was the identical waste that had been approved by the Environmental Health Officer earlier that month. Tr. 229.

48. The waste that was rejected was accepted at the landfill the following day. Tr. 231.

49. The decision to approve or reject Stanadyne's metal hydroxide waste was based on visual inspection. Tr. 240.

50. Some of Stanadyne's waste which was accepted at the landfill was, in the opinion of Stanadyne, "free-flowing". Tr. 212.

51. Windsor Manufacturing Company ("Windsor") is located in Windsor, Connecticut and is a contract machine shop. It generates metal hydroxide waste in sludge form as a by-product of its business. Stip. para. 2.

52. Windsor initially applied to AWPAC for permission to dispose of its hydroxide waste in the landfill in 1974. AWPAC

agreed to accept 25 cubic yards on a test basis. Ex. 23, 24, 26.

53. In January, 1975 Windsor made an initial deposit of 25 cubic yards (approximately 1,000–2,000 tons) of hydroxide waste at the landfill. Tr. 252–262, 271; Ex. 29.

54. The 1975 laboratory analysis of Windsor's hydroxide waste did not contain an analysis of the water content. However, the waste contained approximately 70% water. Tr. 265–266; Ex. 25.

55. The 1977 laboratory analysis of Windsor's waste indicated water content of 70.91%. Ex. 31.

56. During the period 1975 to 1981 Windsor was never required to submit a laboratory analysis of its metal hydroxide waste indicating water content nor was it required to dry its waste to 50% water content to dispose of it in the landfill. The determination of acceptability was based on a visual inspection. During this period the water content of the waste ranged between 60–70%. Tr. 278–287, 294, 297, 299, 306.

57. On more than one occasion the landfill personnel rejected Windsor's waste as being too wet. On these occasions a telephone call was made to the Environmental Health Officer and the waste was accepted for disposal. Tr. 313–314.

58. The consistency of the waste that Windsor deposited in the landfill in 1978 was "a yellow kind of loose material ... that looked like ... half frozen ice cream." It was looser than the waste deposited by Bass. Tr. 322–325.

59. Bass was required to adhere to the 50% water content requirement as substantiated by laboratory analysis. Tr. 424.

60. Windsor and Stanadyne were not required to adhere to the 50% water content requirement in order to deposit metal hydroxide sludge in the landfill. *Id.*

61. Metal hydroxide waste having a water content of 70% could at times appear quite dry and at other times could appear soupy and sloppy. The consistency depended on the chemical properties of the waste. Tr. 501–506.

62. Water content cannot be determined by visual inspection. Visual determination of acceptability based on water content is a subjective test. What appears acceptable to one person can be unacceptable to another. Tr. 287–288. Stip. para. 16.

63. Metal hydroxide sludge with water content of 72% to 82% can exhibit properties of a solid and may not be free flowing. Tr. 501.

64. The relevant criteria in handling metal hydroxide waste is its consistency and whether it can be handled with shovels and excavating equipment. When its water content reaches 72% to 82% it can be difficult to handle but, depending on its specific chemical properties, waste with 82% water content can be moved with a front end loader or backhoe. Tr. 506.

65. The nature of the solids, their overall viscosity, whether they are hydrophilic or hydrophobic and their specific gravity, rather than the percentage of water, determine whether metal hydroxide waste will be liquid or dry. Tr. 506–507.

66. The AWPAC guidelines used to determine acceptability of metal hydroxide waste on visual inspection were whether it "slumped", was "wet", "soupy" or "runny", whether it was "free flowing" or was "seeking its own level." Tr. 432, 626.

67. The various descriptive terms used as guidelines in determining acceptability of the waste have no common, technical or specialized meaning in the area of hydroxide waste disposal. Tr. 493–495; 199–200, 209.

68. In the area of metal hydroxide waste the term free flowing has no technical or specific meaning. Tr. 280, 494.

69. Waste may be considered free flowing if, when dropped on the ground, it tends to spread and form a puddle rather than a pile or if it can flow like a liquid. Tr. 280, 495.

70. The percentage of water contained in metal hydroxide waste is unrelated to whether it is free flowing. Tr. 433–434.

71. The determination of whether waste is free flowing is subjective. Waste which

one person considers free flowing may appear to be non-free flowing to another. Tr. 288.

72. The term "slumping" is not a technical term nor is it commonly used when referring to the consistency of metal hydroxide waste. Tr. 199, 289, 493–494–495.

### Discussion

To recover under 42 U.S.C. Section 1983 the plaintiff must prove that it was deprived of a federally protected right under color of state law. Bass has established that the rules, regulations and procedures of AWPAC[1] governing the disposal of metal hydroxide waste in the landfill violated the due process clause of the fourteenth amendment to the United States Constitution.[2]

▮ In order to invoke due process guarantees there must be a constitutionally protected liberty or property interest at stake. *Estes v. Tuscaloosa County*, 696 F.2d 898 (11th Cir.1983). The property interest at stake in this litigation is the right conferred on residents of the towns of Windsor and Bloomfield, Connecticut to dispose of industrial waste in the landfill. *See Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Having conferred this entitlement, the Town of Windsor became constitutionally obligated to comply with the requirements of due process when it promulgated rules and regulations that affected disposal rights at the landfill.

During the years 1975 to 1981 a business entity seeking to deposit metal hydroxide waste in the landfill was required to apply to AWPAC. In addition to the published guidelines, "Procedures for Accepting Industrial Waste in the Landfill", AWPAC ostensibly employed two tests to determine whether the waste was acceptable. The waste could not contain more than 50% water as established by laboratory analysis

and the waste had to pass a visual inspection. If the sludge did not "run or slump" and if it was not "free flowing" then it could be deposited in the landfill.

▮ Since legislative actions carry with them a presumption of constitutionality, the person complaining of a due process violation must establish that the government body has acted in an arbitrary and irrational manner. *Textile Workers Pension Fund v. Standard Dye & Finishing Co.*, 725 F.2d 843, 949 (2d Cir.), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984). Even in light of this strict constitutional test AWPAC's rules and procedures offend due process in that the 50% water content requirement is not reasonably related to a legitimate governmental objective and was arbitrarily and discriminatorily applied and the standards employed in the visual inspection were impermissibly vague. A governmental regulation that does not impinge on fundamental rights, that is adopted in the interests of the community and is not arbitrary or discriminatory does not violate due process so long as there is a reasonable relationship between it and the legitimate end it seeks to further. *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489–91, 75 S.Ct. 461, 465–66, 99 L.Ed. 563 (1955); *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). The defendant maintains that the 50% water content requirement was adopted to achieve the two important public objectives of preventing hazardous leachate from entering the ground water and insuring that the materials deposited in the landfill would be of a sufficiently solid consistency so that they could be efficiently handled by landfill personnel and equipment.

While these objectives are certainly legitimate they are not reasonably related to the 50% water content requirement. The consensus of expert testimony indicated that a minimum water content of 70% was

---

1. The parties have stipulated that AWPAC acted under color of state law.

2. The plaintiff also alleges a deprivation of the fourteenth amendment's guarantee of equal protection of the laws. In order to establish an equal protection violation the plaintiff must

prove intentional, invidious and discriminatory enforcement of the regulations. *See Inland Steel Co. v. Envtl. Protection Agency*, 574 F.2d 367 (7th Cir.1978). The plaintiff has not made the requisite showing.

sufficient to protect against infiltration of leachate into the ground water supply and that the 50% requirement was unnecessary, unreasonable, unworkable and, from a practical standpoint, almost impossible to achieve. More importantly, there is no rational relationship between the water content of metal hydroxide waste and its consistency. Waste having water content of 70% can have an appearance similar to topsoil or it can be soupy and look like half frozen ice cream. The consistency varies according to the chemical properties of the metals of which it is composed. Thus, there is no reasonable relationship between the 50% water content requirement and the asserted objectives of facilitating its handling by landfill personnel and equipment and preventing leachate from entering the ground water.

The 50% requirement was also discriminatorily enforced. Of the three companies that disposed of metal hydroxide waste in the landfill between 1976 and 1981, only the plaintiff was required to achieve a 50% water content as verified by laboratory analysis before its waste could be deposited in the landfill. The water content of the hydroxide waste deposited by Stanadyne and Windsor averaged about 70% and ranged from 60% to 80%. Unlike the plaintiff, these companies were not required to resubmit a laboratory analysis to prove that the water content of their waste had been reduced to 50%. They received approval to deposit the waste following visual inspection. It is undisputed that water content cannot be determined by visual inspection.

The plaintiff also challenges, on vagueness grounds, the constitutionality of AWPAC's requirement that the waste pass a visual inspection.

■ Vague laws offend due process because they do not give individuals fair notice of the proscribed conduct, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972), and, since they do not limit the exercise of discretion by those charged with their application, they engender the possibility of arbitrary and discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972).

Before metal hydroxide waste could be deposited in the landfill the Environmental Health Officer was required to conduct a visual inspection. If the waste did not "slump" and was not "soupy" or "runny" or "free flowing" it received approval. Each truckload of waste had to pass another visual inspection when it arrived at the landfill. If the landfill personnel determined the sludge was too wet, it was rejected.

■ The AWPAC guidelines did not give fair warning of the consistency that would be accepted and the inspection process fostered ad hoc and subjective determinations. The federal constitution does not preclude a municipality from giving vague or ambiguous directions to individuals who are authorized to make investigations or recommendations but it does require law makers to set reasonably explicit standards for those who are to enforce the rules and regulations. *Grayned v. City of Rockford*, 408 U.S. at 108–09, 92 S.Ct. at 2298–99; *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982); *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982).

■ The degree of vagueness that the constitution tolerates depends on the nature of the enactment. The standard of definiteness is less stringent in the absence of criminal penalties or potential interference with fundamental rights. *Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. at 1193. However, when the persons affected by the regulations are a select group with a specialized understanding of the subject being regulated, the degree of definiteness required to satisfy due process is measured by the common understanding and commercial knowledge of the group. *Fleming v. United States Department of Agriculture*, 713 F.2d 179, 184 (6th Cir.1983).

Those affected by AWPAC's regulations were a select group of local manufacturing companies that generated metal hydroxide waste. The terms used as guidelines to

describe the acceptable consistency of the waste had no common or specialized meaning or understanding. In addition, the inconsistent application of the standards further illustrates their indefiniteness. Waste which was acceptable to the Environmental Health Officer on visual observation could be, and frequently was, rejected by landfill personnel. The consistency of waste that was accepted pursuant to these standards ranged from "loose" to "jelly-like" to "sandy."

 When persons of common understanding and intelligence must guess at a rule's meaning and differ in its application then it is impermissibly vague. *Smith v. Goguen,* 415 U.S. 566, 572 n. 8, 94 S.Ct. 1242, 1246 n. 8, 39 L.Ed.2d 605 (1974). The selective, ad hoc and arbitrary determinations engendered by AWPAC's vague directions to those entrusted with their enforcement as well as their discriminatory application violated the plaintiff's right to due process.

As the regulations promulgated by AW-PAC governing disposal of metal hydroxide waste in the landfill as well as the procedures employed in their enforcement violated the fourteenth amendment to the United States Constitution the plaintiff is entitled to damages under 42 U.S.C. Section 1983.

 The basic purpose of an award of damages under 42 U.S.C. Section 1983 is to compensate for the injuries caused by the deprivation of constitutional rights. *Carey v. Piphus,* 435 U.S. 247, 254–55, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978). As compensatory damages the plaintiff is entitled to recover only those actual damages which it proved with sufficient certainty to be a direct and proximate result of the defendant's wrongful acts. *See id.*

 Bass, as a direct and proximate result of the defendant's due process violations, suffered damages in the amount of $32,819.89. This amount includes the special waste charges and late fees which it paid to the defendant to dispose of the 1,517.86 tons of metal hydroxide waste in the landfill. It also includes the $2,067.02 interest which Bass paid to a lending institution in connection with the loan it was forced to obtain to pay the special waste charges.

The plaintiff also claims as damages the charges it incurred to transport other hydroxide waste to New York for disposal. Notwithstanding the fact that Bass never applied to AWPAC for permission to deposit this waste in the landfill, it did not prove with sufficient or reasonable certainty either that the waste was generated during the period 1976–1982 or the amount that was allegedly generated prior to the imposition of the special waste charge. The court cannot award an amount of damages that is estimated or speculative.

### Conclusion

For the foregoing reasons judgment in the amount of $32,819.89 shall enter in favor of the plaintiff. As the plaintiff is the prevailing party it is entitled to a reasonable attorney's fee under 42 U.S.C. Section 1988. Upon the filing of an appropriate motion, the court will hear arguments of counsel concerning the amount to be awarded.