DIAMOND WASTE, INC., Plaintiff,

v.

MONROE COUNTY, GA.,
et al., Defendants.

C.A. 91–379–2–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

May 12, 1992.

**1512**

Linwood Robert Lovett, Macon, Ga., for plaintiff.

Frederick L. Wright, II, Atlanta, Ga., W. Franklin Freeman, Jr., Forsyth, Ga., James Albe Vaughn, Forsyth, Ga., for defendants Monroe County, Ga., Monroe County Bd. of Com'rs, and Thomas H. Wilson.

## ORDER

OWENS, Chief Judge.

At issue in this case is the constitutionality of a Monroe County ordinance that regulates the transport of out-of-county waste into Monroe County. The defendants have filed a motion to dismiss and seek summary judgment on some of plaintiff's claims. Plaintiff has filed a motion for a preliminary injunction to enjoin the enforcement of the ordinance until this case is decided upon the merits.

## FACTS

On April 15, 1977, the Environmental Protection Division ("EPD") of the Georgia Department of Natural Resources issued a solid waste handling permit to the city of Forsyth, Georgia ("City"). The City is located within Monroe County, Georgia ("County"). The EPD permit authorized the City to operate a landfill located in what is now an incorporated area of the City. The landfill was used exclusively by the City and the County until October, 1989, when the City decided to contract with a private operator, plaintiff Diamond Waste, Inc. ("DWI") to operate the landfill.

On October 12, 1989, the City and DWI entered into an agreement under which DWI was to operate and manage the existing City landfill as a regional landfill. A regional landfill is one which accepts waste from outside of the County. DWI immediately began operating the landfill as a regional landfill, and the EPD transferred the City's solid waste handling permit to DWI.

DWI made several proposals to the County to dispose of the County's waste, but the County rejected them because DWI was operating the landfill as a regional landfill. Instead of disposing its waste at the City landfill, the County began transporting its waste to Crawford County, Georgia. The County has also chosen a site for a new County landfill, and the site has been approved by the EPD. The Coun-

ty has applied for a permit to operate the landfill, and the landfill is projected to have the capacity to accept County waste for fifty years. The County has agreed to allow Crawford County to transport waste into the County for disposal at the future landfill when it begins operating in the spring of 1992.

On October 25, 1989, in an attempt to prevent DWI from operating the City landfill as a regional landfill, the Monroe County Board of Commissioners ("Board") passed a resolution that prohibited anyone from transporting out-of-county waste into the County. This court held that the resolution was an unconstitutional burden on interstate commerce in *Diamond Waste, Inc. v. Monroe County*, 731 F.Supp. 505 (M.D.Ga.1990), *aff'd in part and vacated in part, Diamond Waste, Inc. v. Monroe County*, 939 F.2d 941 (11th Cir.1991) *("Diamond I")*.

On October 30, 1991, the Board passed a new ordinance regulating the transport of out-of-county waste into the County. The only notice that such an ordinance was to be discussed was posted on the door of the County Office Building on October 28, 1991. (A copy of this notice is attached as Exhibit 1.) The legal organ for Monroe County was contacted as well, but this notice was given too late to be published in the weekly edition. Notice that the October 30, 1991, meeting was to address the 1992 budget was published in the local paper two weeks earlier. DWI and its customers were unaware that the ordinance was to be addressed at the meeting. No one was present at the meeting to represent the interests of DWI or its customers.

At the meeting, no evidence of environmental harms caused by out-of-county waste was presented. No evidence on road damage caused by vehicles carrying out-of-county waste was presented. Furthermore, no evidence on the need for landfill space in the county was presented. The County attorney presented the ordinance that he had drafted, and it was reviewed and discussed. At least one commissioner saw the ordinance for the first time that evening.

Before passing the ordinance, the Board had to determine the per ton fee to charge on out-of-county waste. Five dollars per ton was determined to be reasonable because it was equal to half of the $10 dollar per ton fee charged by the state on out-of-state waste. The primary purpose of the fee is to cover the costs of repairing county roads. No evidence was presented to establish the cost of maintaining roads damaged by vehicles carrying out-of-county waste. The ordinance passed 5–0.

The ordinance first states that its legislative purpose is to preserve available landfill space in the County, to protect the environment from increased pollution caused by imported waste, and to maintain the roads burdened by the increase in traffic transporting imported waste.

The ordinance also contains the following key provisions:

(c) *Permit Required to Import Waste.* No person shall transport, pursuant to a contract, whether oral or otherwise, imported waste into Monroe County for the purpose of disposing of such waste at a publicly or privately owned landfill, unless a waste importation permit is first obtained from the Board.

(d) *Permits Issued Annually.* The Board will take action on waste importation permit applications once per year at its regularly scheduled meeting on the first Tuesday in December. Permits issued, if any, shall be valid for one calendar year commencing on the first day of the following January. Permits shall not be renewable, and a permit holder desiring to continue transporting imported waste into Monroe County after the expiration of an existing permit must first make timely application for, and receive, a new permit.

. . . . .

(g) *Permit Fee and Reporting Requirements.*

(1) Each holder of a waste importation permit shall pay to Monroe County a fee of $5.00 for each ton of imported waste transported into Monroe County pursuant to that permit. Payment of that fee shall be made quarterly and

must accompany the report required by subsection [ (2) ].

(2) Each holder of a waste importation permit shall submit a verified written report to the Board within ten (10) days after the close of each calendar quarter. That report shall identify by exact dates the period covered by the report, all counties from which imported waste was collected during the reporting period, the tonnage of imported waste collected from each county, and the total tonnage of imported waste collected from each county, and the total tonnage of imported waste transported into Monroe County during the reporting period.

The permit application procedures set out in the ordinance are quite extensive. An applicant must submit an application by the first Tuesday in November immediately preceding the year for which the permit is sought. The application must also provide the total monthly tonnage to be transported into the county during the next year, all counties from which the out-of-county waste will be generated and/or collected, a description of the waste, a description of each vehicle that may be used to transport the waste, the proposed route by which the waste will be transported within the County, and information about the applicant's motor vehicle insurance. In addition, the applicant must attach to the application written verification from the EPD that the landfill in which the waste will be disposed is in compliance with laws governing solid waste disposal, that the disposal of applicant's waste in that landfill falls within the scope of the landfill's EPD permit, and that the applicant has not violated any environmental regulations. Finally, each applicant must hold a public hearing on its application before the Board will consider the application. (A copy of the ordinance is attached to this order as Exhibit 2.)

On November 1, 1991, two days after the ordinance was passed, DWI received a letter from an attorney for the Board, which stated as follows:

Monroe County intends to file papers in the near future asking the Monroe County Superior Court to enjoin Diamond Waste from further violation of O.C.G.A. § 36–1–16 and to fashion some appropriate remedy for Diamond Waste's knowing and intentional past violations of that statute. Until the Court rules on that request, Monroe County demands that Diamond Waste immediately cease and desist from importing any waste into Monroe County without first obtaining permission from Monroe County.

On November 5, 1991, DWI filed this lawsuit seeking the court to enjoin the enforcement of the ordinance and to declare the ordinance unconstitutional. DWI specifically claims that the ordinance places an excessive burden on interstate commerce and that it is arbitrary and capricious and not rationally related to a legitimate purpose, in violation of substantive and procedural due process.

A hearing on DWI's motion for a preliminary injunction was held on December 19, 1991, and additional briefs and affidavits were filed after the hearing. These affidavits contain commercially sensitive information and have been placed under seal.

Until the County landfill begins operation, the City landfill is the only landfill currently operating in Monroe County. Under the contract between DWI and the City, DWI is to operate the City landfill as a regional landfill. This arrangement was reached because the amount of waste generated within the City and the County is not enough to make it economically feasible for DWI to operate the landfill.

When DWI assumed the operation of the City landfill, the landfill was in very poor condition and posed an environmental threat. DWI spent nearly one million dollars improving the conditions at the landfill.

DWI's primary business comes from contracts that it has with waste transport companies. These companies collect waste from various sites within and without Monroe County. None of these companies collect waste from outside of Georgia. Two of these companies testified that if they have to submit an application as required under the County ordinance, they will can-

cel their contracts with DWI. They first claim that the $5–per–ton fee charged to out-of-county waste is not acceptable. DWI must absorb this cost if they are to continue to do business with DWI.

However, these companies also claim that even if DWI absorbs the $5–per–ton fee, they will be unlikely to do business with DWI because the other requirements of the ordinance are too burdensome. The annual permit is inflexible as to monthly tonnage allowed, and it prevents them from bidding for multi-year contracts. In addition, the permit requires disclosure of commercially sensitive information.

Hence, DWI will either lose most of its business or be forced to absorb a $5–per–ton fee on out-of-county waste if its customers are required to comply with the ordinance. DWI has established that a loss of $5 per ton of out-of-county waste will make it impossible for it to continue operations.

Furthermore, the ordinance prevents DWI from entering any future contracts. Because the ordinance provides for an annual nonrenewable permit, DWI's old and potential customers are in a position of uncertainty from year to year as to whether they will be able to transport waste into the County in the next calendar year. Moreover, during the permit year, DWI cannot obtain any new business because no one can obtain a permit until December. Finally, the customers with permits cannot increase their business during the year because they are limited by the monthly totals specified in their permits.

In addition to accepting waste that has been transported by other customers, DWI transports waste itself, and, as a transporter of out-of-county waste, it is required to obtain an annual permit under the ordinance. DWI currently has a transport contract with a recycling facility in Bibb County, Industrial Recovered Materials ("IRM"). DWI and IRM have a close relationship because they are owned by the same principals. IRM collects waste from Alabama, Kentucky, and other areas. This waste is processed at IRM, the recoverable portion of the waste is sold if a market is available, and DWI transports the remainder to the City landfill. The availability of the City landfill is crucial to IRM's operations.

In addition, DWI owns a recycling facility in Florida. While DWI currently is only authorized by the EPD to accept solid waste that has been generated within the state of Georgia, it has applied for a permit to allow it to collect waste from outside the state. It specifically plans to transport the waste from its Florida recycling facility to the City landfill. DWI has also applied for EPD permits to expand the available space in the landfill.

DWI has shown that if it has to comply with the ordinance, it will be unable to continue transporting waste from the IRM recycling facility in Bibb County. It also will not be able to transport waste from its Florida facility. The $5–per–ton fee is too high to make it economically feasible for DWI to transport waste into the County. Moreover, the ordinance requires the applicant to submit information about the amount and type of waste to be transported from each county, and DWI claims that this is commercially sensitive information. DWI also claims that information on trucks and routes to be used is burdensome because it is impossible to predict such information one year in advance.

Finally, DWI claims that if it is limited to accepting only waste from within the County, it will be unable to maintain the environmental controls at the landfill. The revenues generated from the out-of-county waste are necessary to cover the cost of these controls. The landfill would have to be closed.

Thus, DWI seeks a preliminary injunction to enjoin defendants from enforcing the ordinance until its constitutionality has been determined. Defendants have filed a motion to dismiss claiming that DWI lacks standing to assert its Commerce Clause claims and that DWI's due process claims are not ripe. They also seek summary judgment on DWI's claim that the ordinance is invalid on its face under the Commerce Clause and on all of DWI's due process claims.

## DISCUSSION

### I. The Commerce Clause

DWI claims that the County ordinance is unconstitutional because it is a burden on interstate commerce. They claim that they have a likelihood of success on the merits and meet the other requirements for a preliminary injunction. Defendants contend that DWI lacks standing to assert its Commerce Clause claims and therefore, the claims should be dismissed. They also seek summary judgment on DWI's claim that the ordinance is facially invalid under the Commerce Clause.

### A. Standing

■ There are two basic requirements a plaintiff must show to satisfy the requirements for standing. First, a plaintiff must show that he has suffered an injury in fact that was caused by the challenged activity and that can be redressed by the court. *E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 984 (11th Cir.1990). DWI has satisfied this requirement by alleging that it will suffer economic injury through enforcement of the County ordinance. *Government Suppliers Consolidating Services, Inc. v. Bayh*, 753 F.Supp. 739, 759 (S.D.Ind.1990) (citing *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 267, 104 S.Ct. 3049, 3053, 82 L.Ed.2d 200 (1984)) (economic injury is sufficient to establish standing).

A plaintiff must also show that he falls within the "zone of interests" to be protected by the Commerce Clause. *Clarke v. Securities Industrial Assn.*, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). According to defendants, DWI is not protected by the Commerce Clause because it does not dispose of any solid waste, as defined in O.C.G.A. § 12–8–22(30), that was generated outside the state of Georgia.

Under the Georgia Waste Management Act, a person must be authorized by the EPD to handle solid waste. O.C.G.A. § 12–8–24(a). The term "solid waste" is defined in O.C.G.A. § 12–8–22(30) as:

[D]iscarded putrescible and nonputrescible waste, except water carried body waste and *recovered materials*, and shall include garbage; rubbish, such as paper, cartons, boxes, wood, tree branches, yard trimmings, furniture and appliances, metal, tin cans, glass, crockery, or dunnage; ashes; street refuse; dead animals; sewage sludges; animal manures; industrial waste, such as waste materials generated in industrial operations; residue from solid waste thermal treatment technology; food processing waste; demolition waste; abandoned automobiles; dredging waste; construction waste; and any other waste material in a solid, semi-solid, or liquid state not otherwise defined in this part. (emphasis added).

"Recovered materials" are materials with recycling potential that are taken to a recycling facility instead of a landfill. The § 12–8–22(30) definition of "solid waste" does not include waste generated outside the state of Georgia. Out-of-state waste is classified as "special solid waste."

The disposal of "solid waste" requires a "solid waste handling permit" while the disposal of "special solid waste" requires a "special solid waste handling permit." DWI only has a solid waste handling permit; therefore, it cannot accept any waste in the City landfill that was converted into § 12–8–22(30) solid waste before it crossed state lines. If DWI were to accept any waste material that had become § 12–8–22(30) solid waste while the waste was *outside* the state of Georgia, DWI would violate Georgia law.

According to defendants, because DWI transporters cannot cross state lines to collect § 12–8–22(30) solid waste and DWI customers cannot bring § 12–8–22(30) solid waste from outside of Georgia, DWI is not a part of interstate commerce and has no standing to bring a commerce clause claim. This argument implicitly means that the disposal of materials that become § 12–8–22(30) solid waste while within the state of Georgia is purely a matter of local concern because when materials transported from outside of Georgia come into Georgia and are converted into § 12–8–22(30) solid waste, they are no longer in the stream of interstate commerce. Because DWI is not

part of interstate commerce, it is not within the "zone of interests" protected by the Commerce Clause and consequently, has no standing to bring such a claim.

■ This argument fails for several reasons. First, solid waste disposal is a matter of national concern, and Congress has expressly addressed this concern in the Solid Waste Disposal Act, 42 U.S.C. § 6903 *et seq.* Thus, solid waste disposal concerns interstate commerce.

■ Second, industries and other entities engaging in interstate commerce have to have a means of solid waste disposal. They contract with waste transporters to arrange to dispose of this waste, and such contracts are crucial to their ability to engage in interstate commerce. While the unavailability of one landfill may not place a huge burden on interstate commerce, if all Georgia counties limited waste disposal like Monroe County has, the cumulative effect would be disastrous on industry.[1]

Third, the fact that DWI operates only within the state of Georgia does not mean that DWI is not a part of interstate commerce. *See Executive Town & Country Services, Inc. v. Atlanta,* 789 F.2d 1523 (11th Cir.1986) (limousine service operating wholly within the state of Georgia was a part of interstate commerce where vast majority of its business consisted of prearranged trips to and from international airport). Like the plaintiff in *Executive Town,* DWI primarily functions through contractual arrangements with waste transporters and waste generators. A portion of the waste deposited in the City landfill comes from recycling facilities. A recycling facility, like IRM, collects recyclable materials from within and without Georgia. (A solid waste handling permit is not required to transport recyclable materials, and the County ordinance does not apply to the transport of such materials.) The facility then processes these materials to separate the useable portion from the unusable § 12–8–22(30) solid waste portion and disposes of the solid waste portion in

the City landfill through a contract with DWI or with a DWI customer. DWI is a vital part of the recycling process.

Finally, DWI has applied for a "special solid waste handling permit" in order to expand its operations. In particular, it plans to ship § 12–8–22(30) solid waste from its recycling facility in the state of Florida. If it obtains this permit, DWI will actively cross state lines to transport solid waste.

Based on the above reasons, the court finds that DWI is within the "zone of interests" protected by the Commerce Clause. Its ability or inability to operate impacts the flow of interstate commerce. Therefore, DWI has standing to assert its commerce claims.

## B. Facial Invalidity Under the Commerce Clause

■ Defendants seek summary judgment on DWI's claim that the ordinance violates the Commerce Clause on its face. They base their argument on the fact that the ordinance treats interstate waste and intrastate waste equally. The Eleventh Circuit previously found that the County ban on importation of out-of-county waste did not facially violate the Commerce Clause. *Diamond I,* at 944. Hence, the ordinance at issue does not violate the Commerce Clause on its face. Accordingly, summary judgment on this claim is GRANTED.

## C. Preliminary Injunction

To obtain a preliminary injunction, plaintiff must show the following:

1) There is a substantial likelihood that plaintiff will prevail on the merits at trial;

2) Plaintiff will suffer irreparable harm if the preliminary injunction is not granted;

3) The injury to plaintiff outweighs any harm the preliminary injunction will cause to defendant; and

---

1. The court notes that neighboring Bibb County has passed a similar regulation on the importa-
tion of out-of-county waste.

4) The preliminary injunction will not be adverse to the public interest.

*All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.,* 887 F.2d 1535, 1537 (11th Cir.1989).

### 1. Likelihood of Success on the Merits

■ To be successful on the merits in this case, DWI must show that the ordinance is an unconstitutional burden on interstate commerce. Because the ordinance applies equally to interstate and intrastate commerce, the appropriate test for a Commerce Clause analysis is the test set forth by the Supreme Court in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970):

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

In this case, the ordinance regulates evenhandedly and its purpose is to protect legitimate local public interests. The Eleventh Circuit previously found that the County has legitimate legislative interests in preserving landfill space and in protecting the environment from increased pollution and traffic resulting from the importation of out-of-county waste. *Diamond I,* at 944.

However, in the earlier case, the Eleventh Circuit found that the possible effects on interstate commerce by a ban on out-of-county waste were not "incidental." DWI, although it was not receiving waste from outside of Georgia, had received inquiries concerning the importation of 180 tons of waste daily from outside the state. Moreover, if other counties were to adopt similar bans on waste importation, there would

be a substantial impact on interstate commerce. *Id.* at 945.

In the present case, DWI could show at trial that the effect on interstate commerce is more than incidental. There is already a danger of a cumulative burden on interstate commerce caused by regulation of imported waste in other counties. Neighboring Bibb County has passed a similar ordinance. In addition, DWI plans to expand its operations to transport waste directly across state lines. Thus, the court could find that there is more than an incidental effect on interstate commerce.

Also in the earlier case, the Eleventh Circuit found that the County could have achieved its objectives " 'with a lesser impact on interstate activities.' " *Id.* at 945 (quoting *Pike v. Bruce Church,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)). Instead of an absolute ban, the County:

> [C]ould reduce the amount of garbage deposited by setting reasonable daily tonnage limits on imported waste and granting permission to dump on a "first come, first served" basis. Or Monroe County could auction permits for dumping fixed amounts of imported waste. Or dumping rights for out-of-county garbage could be established by lottery. While this is not an exhaustive list of alternatives available to Monroe County, this list does show that Monroe County can avoid burdening interstate commerce while feasibly protecting available landfill space, its citizens, and the environment.

*Id.*

Defendants claim that the new ordinance follows this guidance from the Eleventh Circuit, and therefore, DWI cannot succeed on the merits on its commerce clause claim. The new ordinance is not an absolute ban on out-of-county waste; hence, it passes the *Pike* test.

However, DWI has shown that if the ordinance is enforced against DWI and its customers, no out-of-county waste will be transported into the County. Neither DWI nor its customers can remain competitive with the charge of a $5–per–ton fee. More-

over, the other ordinance requirements, particularly the nonrenewable annual permit, the once-per-year filing date, the public hearing requirements, and the inflexible monthly tonnage specifications, are too burdensome to make compliance feasible. Thus, DWI could show at trial that the ordinance has the effect of an absolute ban on out-of-county waste, and this would be invalid under the earlier decision by the Eleventh Circuit. Hence, DWI has shown that it has a likelihood of success on the merits at trial.

### 2. Irreparable Harm

The second requirement DWI must show is that it will suffer irreparable harm if the preliminary injunction against enforcement of the ordinance is not granted. DWI has presented evidence that if the ordinance is enforced, it will lose customers, it will be unable to obtain new customers, and it will not be able to perform its transport contract with an out-of-county recycling facility. Thus, it will experience tremendous business losses.

Furthermore, no more out-of-county waste will be disposed in the landfill, and DWI depends upon the revenues generated by this volume of waste to operate the landfill. The loss of these revenues will not only prevent DWI from performing its contract with the City to operate the landfill but also will force DWI out of business. This is clearly a showing of irreparable harm. *Tri–State Generation and Transmission Asso. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir.1986); *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co.*, 749 F.2d 124 (2d Cir.1984); *Westin v. McDaniel*, 760 F.Supp. 1563, 1569 (M.D.Ga.1991).

### 3. The Injury to Plaintiff Outweighs Injury to Defendant

DWI must next show that the irreparable injury outweighs any damage caused to defendants by the injunction. Without the injunction, DWI will lose its business. With the injunction, defendants will be prevented from regulating waste importation so as to allegedly conserve available landfill space, to protect the environment from increased pollution, and to protect the roads from increased traffic until this case is decided on the merits.

DWI's injury clearly outweighs any possible harm to defendants. First, the County does not even use the City landfill. It transports its waste to another county and is in the process of building another landfill to last for fifty years. Thus, there is not an urgent need to preserve the available landfill space in the City landfill.

Second, DWI has shown that if it is forced to comply with the ordinance, it will be unable to maintain the landfill with adequate environmental controls. Thus, DWI's forced compliance with the ordinance would seem to be more of a threat to the environment than pollution caused by the importation of out-of-county waste.

Finally, defendants have produced virtually no evidence on the harms to the environment and the roads caused specifically by the importation of out-of-county waste. The County conducted no studies prior to the adoption of the ordinance. Thus, defendants will suffer very little harm by the grant of a preliminary injunction against the enforcement of the ordinance.

### 4. The Injunction Will not be Adverse to the Public Interest

Finally, DWI must show that the injunction will not be adverse to the public interest. As discussed previously, defendant has not shown that the importation of out-of-county waste poses any harm to the environment. Furthermore, defendant has presented very little evidence of damage to County roads caused by trucks importing waste to the landfill. The only evidence presented concerned the rapid wear of the road leading directly to the landfill, and there was no evidence that this damage was caused by trucks carrying out-of-county waste rather than in-county waste.

In addition, the County does not even use the City landfill; hence, the public does not have a strong interest in preserving the space in this landfill. Moreover, the County has found a suitable site for an additional landfill, and this site was chosen out of a

possible ten sites. Thus, there is apparently not a shortage of landfill space in the County.

Therefore, though the public has legitimate interests in preserving landfill space and protecting the environment and the roads, and the ordinance allegedly furthers those interests, a preliminary injunction against the enforcement of the ordinance until this case is decided upon the merits will not be adverse to those interests.

As DWI has met all the requirements for a preliminary injunction, DWI's motion for a preliminary injunction is GRANTED.

## II. The Due Process Claims

DWI also claims that defendants violated its procedural and substantive due process rights. Defendants first contend that these claims are not ripe and should be dismissed. They also contend that DWI fails to state a claim upon which relief can be granted and are therefore entitled to summary judgment.

### A. *Ripeness*

■ Defendants contend that the court has no subject matter jurisdiction over DWI's due process claims because they are not ripe and must be dismissed. In its complaint, DWI alleges that the adoption of the Monroe ordinance was arbitrary and capricious conduct, that the ordinance requirements are abusive and not rationally related to any legitimate purpose, and that the ordinance was adopted for the sole purpose of making it economically infeasible to operate the landfill.

Defendants contend that DWI's claim is essentially a claim against a "taking" without due process, and DWI has failed to exhaust available state remedies. Thus, the claim is not ripe and must be dismissed for lack of subject matter jurisdiction. *Williamson County Regional Planning Com. v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

In contrast, DWI contends that its due process claims are not "taking" claims, but, instead, are allegations that the ordinance facially deprives DWI of a property interest by arbitrary and capricious regulation.

DWI relies upon *Eide v. Sarasota County,* 908 F.2d 716 (11th Cir.1990), in which the Eleventh Circuit held that facial arbitrary and capricious due process claims are ripe at "'the moment a governmental decision affecting his [or her] property has been made in an arbitrary and capricious manner.'" *Eide,* at 725–26 n. 16 (quoting *Greenbriar, Ltd. v. Alabaster,* 881 F.2d 1570, 1574 n. 8 (11th Cir.1989)). The court finds that DWI's due process claims are facial arbitrary and capricious due process claims, and therefore, they are ripe for decision.

### B. *Procedural Due Process*

■ Defendants contend that they are entitled to summary judgment on DWI's procedural due process claims because the notice given of the October 30, 1991, meeting in which the waste ordinance was adopted complied with the notice requirements under O.C.G.A. § 50–14–1(d). The statute requires notice of special meetings to be posted "for at least 24 hours at the place of regular meetings" and written or oral notice must be given "at least 24 hours in advance of the meeting" to the legal organ of the county or its equivalent.

Defendants posted notice of the October 30, 1991, meeting on the door of the Monroe County Commission office building and notified the legal organ of Monroe County more than 24 hours prior to the meeting. In addition, the meeting was open to the public. Therefore, defendants claim they are entitled to summary judgment on DWI's procedural due process claim.

"Due process requires 'notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Dirt, Inc. v. Mobile County Com.,* 739 F.2d 1562 (11th Cir.1984) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)). In *Dirt,* a landfill operator's procedural due process rights were violated when it was not notified of a meeting in which its application for a permit to manage solid waste was considered. This total failure to give

notice did not meet the Supreme Court standard of due process.

In this case, while the Board met the technical requirements of § 50–14–1(d), the court cannot find as a matter of law that this compliance satisfies procedural due process. It is undisputed that the Board knew that the ordinance would affect DWI's business in operating the landfill. Furthermore, notice of the meeting was not actually published in the legal organ of the County because the meeting occurred before publication was possible. Therefore, the only available notice of the meeting was the notice posted on the door of the County office building. The court cannot find that this notice was adequate as a matter of law, and, accordingly, defendants' motion for summary judgment on DWI's procedural due process claims is DENIED.

## C. Substantive Due Process

■ Defendants contend that they are entitled to summary judgment on DWI's substantive due process claims. In order to establish a substantive due process claim, DWI must show " 'deprivation of a property interest for an improper motive and by means that were pretextual, arbitrary and capricious, and ... without any rational basis.' " *Spence v. Zimmerman,* 873 F.2d 256, 258 (11th Cir.1989) (quoting *Hearn v. City of Gainesville,* 688 F.2d 1328, 1332 (11th Cir.1982)).

Defendants first contend that DWI has no property interest that has been deprived by the ordinance. They claim that the ordinance applies to one's right to transport waste into the County and that DWI has no property interest in this right. However, DWI has produced evidence that it will lose its business if the ordinance is enforced. The court finds that this is a sufficient property interest to overcome defendants' motion for summary judgment. *See also Bass Plating Co. v. Windsor,* 639 F.Supp. 873 (D.Conn.1986) (right to dispose of industrial waste in landfill was constitutionally protected property interest).

Defendants also contend that the ordinance is clearly rationally related to the preservation of legitimate state interests, and, therefore, they are entitled to summary judgment. The ordinance states that its purpose is to preserve landfill space, to protect the environment, and to protect roads. These are legitimate state interests. *Diamond I,* at 944.

However, there is a dispute as to whether the ordinance actually accomplishes its purpose of protecting these interests. DWI has presented evidence that the loss of revenues generated from the deposit of out-of-county waste in the landfill will, at a minimum, prevent it from maintaining adequate environmental controls at the landfill. This result does not serve to protect the environment.

Moreover, defendants have submitted no rational basis for the $5–per–ton fee. Apparently, this figure was simply pulled from the air because it seemed reasonable. There is nothing in the record to show that $5 per ton is necessary to maintain County roads damaged by vehicles carrying out-of-county waste. Hence, DWI could show that the $5 fee is arbitrary and unrelated to protecting roads damaged by the transport of out-of-county waste.

In addition, the ordinance provides for a once-per-year chance to get a permit to transport waste. Defendants have presented nothing to show how this once-per-year process relates to preserving landfill space and protecting the environment and County roads. Thus, it is not clear that the ordinance is rationally related to preserving legitimate state interests.

Because there is a dispute as to whether the ordinance is rationally related to legitimate state interests, defendants' motion for summary judgment on DWI's substantive due process claims is DENIED.

## CONCLUSION

Plaintiff DWI has met the requirements for a preliminary injunction. Accordingly, the court GRANTS a preliminary injunction enjoining defendants from enforcing the ordinance at issue until this case is decided on the merits. As required under Rule 65 of the Federal Rules of Civil Procedure,

## 1522

plaintiff is ORDERED to post a $10,000 bond to cover any costs and damages that may be incurred or suffered by defendants found to have been wrongfully enjoined.

In addition, the court DENIES defendants' motion to dismiss DWI's commerce clause claims for lack of standing and DWI's due process claims for lack of ripeness. The court also DENIES defendants' summary judgment motion on DWI's procedural and substantive due process claims. However, the court GRANTS defendants' summary judgment motion on DWI's claim that the ordinance facially violates the Commerce Clause.

SO ORDERED.

EXHIBIT 1

NOTICE OF

SPECIAL MEETING

AND

PUBLIC HEARING

The Monroe County Board of Commissioners hereby gives notice that a special meeting and a public hearing regarding the General Funds Proposed Budget for 1992 shall be conducted on October 30, 1991 at 5:00 p.m. at the office of the Monroe County Commissioners, 38 W. Main Street, Forsyth, Georgia, at which time any persons wishing to be heard on the budget may appear. At present, based on budget work sessions, it is projected that there will be no increase in the County's portion of the millage rate over last year's millage rate of 6.1 mills.

The General Funds Proposed Budget for 1992 is available for public inspection at the County Commissioners' Office from 8:30 a.m. to 4:30 p.m., Monday–Friday.

The Board of Commissioners will also consider adoption of an ordinance for the management of solid waste importation.

The Board of Commissioners may also discuss and act upon such other business as may be presented.

Posted: October 28, 1991

EXHIBIT 2

RESOLUTION

BE IT RESOLVED pursuant to a motion made and duly passed in a meeting open to the public that the BOARD OF COMMISSIONERS OF MONROE COUNTY, GEORGIA, are in agreement that the Code of Ordinances, Monroe County, Georgia, is hereby amended by adding a section to be number Sec. 11–20, which section reads as follows:

Sec. 11–20. Importation of Waste.

(a) *Findings and Policy.* Pursuant to O.C.G.A. § 36–1–16, no person may transport waste into Monroe County for disposal at a public or private landfill without first obtaining permission from the Board. The policy of the Board is to enforce without exception the requirements of O.C.G.A. § 36–1–16 and to take appropriate and lawful measures to prevent any violation thereof.

Whenever a proper request for permission to import waste for disposal is presented to the Board, the Board intends not to withhold its permission without good reason. The Board finds, however, that a need exists to regulate, under O.C.G.A. § 36–1–16 as well as the inherent police powers of Monroe County, the transportation and disposal of imported waste within the boundaries of Monroe County.

There exists a very limited amount of available landfill space within Monroe County. Much of that available landfill space is necessary to accommodate the disposal of waste generated and collected within Monroe County. The disposal of imported waste necessarily reduces the amount of existing landfill space that will be available for the disposal of the waste generated and collected within Monroe County.

The disposal of imported waste increases the total volume of waste disposed of within Monroe County, and therefore creates more pollution and increases the threat of environmental damage or degradation. In addition, the disposal of imported waste increases the cost of road maintenance due to the increased number of heavy vehicles

that must travel on Monroe County's roads to transport the imported waste to the disposal site.

Monroe County has legitimate legislative interests in extending the life of available landfill space within Monroe County and in protecting the people, resources, and environment of Monroe County from the effects of increased pollution and traffic caused by the disposal of imported waste within its boundaries. In furtherance of those interests, the Board has determined to take reasonable, lawful, and appropriate measures, including the enactment of this legislation, to insure that the disposal of imported waste within Monroe County does not consume available landfill space that is or will be needed for the disposal of waste generated and/or collected within Monroe County; does not adversely affect the health or well-being of the people of Monroe County; does not diminish or degrade the quality of Monroe County's air, soil, water, and other natural resources and environment; does not conflict with Monroe County's short-term and long-term land use plans; and does not place an unreasonable or disproportionate burden on the road maintenance and other public services provided by Monroe County.

(b) *Definitions.* As used herein:

(1) "Board" means the Board of Commissioners of Monroe County, Georgia.

(2) "Imported waste" means any waste generated or collected outside Monroe County, Georgia.

(3) "Person" means any individual, public corporation, private corporation, partnership, municipality, county, political subdivision, state or any agency or institution thereof, or any other entity of any kind, including the federal government and its employees, departments, and agencies.

(4) "Waste" means discarded putrescible and nonputrescible wastes of any kind, except water-carried body waste, and shall include without limitation: garbage; trash; refuse; rubbish such as paper, cartons, boxes, wood, tree branches, yard trimmings, furniture and appliances, metal, tin cans, glass, crockery, or dunnage; ashes; street refuse; dead animals; sewage sludges; animal manures; industrial wastes such as waste materials generated in industrial operations; residue from solid waste thermal treatment technology; food processing wastes; demolition wastes; abandoned automobiles; dredging wastes; construction wastes; and any other waste material in a solid, semisolid, or liquid state not otherwise defined in O.C.G.A. § 12–8–20, et seq.

(5) "Waste importation permit" means a permit to transport imported waste into Monroe County for the purpose of disposing of such waste at a publicly or privately owned landfill located in Monroe County.

(c) *Permit Required to Import Waste.* No person shall transport, pursuant to a contract, whether oral or otherwise, imported waste into Monroe County for the purpose of disposing of such waste at a publicly or privately owned landfill, unless a waste importation permit is first obtained from the Board.

(d) *Permits Issued Annually.* The Board will take action on waste importation permit applications once per year at its regularly scheduled meeting on the first Tuesday in December. Permits issued, if any, shall be valid for one calendar year commencing on the first day of the following January. Permits shall not be renewable, and a permit holder desiring to continue transporting imported waste into Monroe County after the expiration of an existing permit must first make timely application for, and receive, a new permit.

(e) *Permit Application Procedures.*

(1) Every applicant for a waste importation permit must submit a sealed envelope containing the original and six (6) copies of its application to the office of the Monroe County Commission Clerk not later than 12:00 noon on the first Tuesday in November of the year immediately preceding the calendar year for which a permit is sought. All applications timely submitted will be

presented to the Board at its regularly scheduled meeting on that same first Tuesday in November, at which time the Board will open the applications and publish the contents thereof.

(2) Application shall be made in writing, shall be signed by the applicant, and shall contain a sworn statement by the applicant that all information in the application is true, complete and correct. The application shall set forth the following information:

(a) The applicant's full name, address, and telephone number;

(b) The total monthly tonnage of imported waste for which the permit is sought;

(c) All counties within which the imported waste will be generated and/or collected;

(d) A description of the imported waste;

(e) The landfill within which the imported waste will be placed;

(f) A description of each truck or other motor vehicle that may be used to transport the imported waste within Monroe County, including the size, weight, load capacity, state of registration, motor vehicle tag number, and owner of each such truck or other motor vehicle;

(g) The proposed route(s) by which the imported waste will be transported within Monroe County, and the number of times each such route will be traveled per month by the trucks or other motor vehicles transporting the imported waste;

(h) A description of the applicant's motor vehicle liability insurance coverage, including name of insurance company, policy number, kinds of coverage, and policy limit for each kind of coverage;

(i) If the applicant is a corporation, its state of incorporation, date of incorporation, and the names and addresses of its officers, directors, and registered agent for service of process in Georgia;

(j) If the applicant is a partnership, the names and addresses of all general partners; and

(k) The date, time, and location of the public hearing required by subsection (d).

(3) Every application for a waste importation permit shall have attached thereto the following:

(a) Written verification from the Georgia Department of Natural Resources, Environmental Protection Division ("EPD"), that each landfill into which the imported waste will be placed is being operated in compliance with all conditions of a valid waste handling permit issued by EPD, a Design and Operation Plan approved by EPD, the Georgia Comprehensive Solid Waste Management Act, and all other applicable laws;

(b) With respect to each landfill into which the imported waste will be placed, written verification from EPD that the proposed placement of imported waste into the landfill is within the scope of operation allowed under the waste handling permit and Design and Operation Plan for the landfill;

(c) Written verification from EPD that the applicant has not been found by EPD to have been in violation of any Georgia environmental statute, rule, or regulation within the past ten (10) years;

(d) A sworn statement by the applicant stating that neither the applicant, nor any of its officers, directors or general partners have been convicted of a felony of any kind or of a misdemeanor involving moral turpitude within the past ten (10) years;

(e) With respect to each county within which the imported waste will be collected, written verification from the governing authority of the county that the applicant has obtained permission from such governing authority to transport the imported waste into Monroe County.

(4) Upon submission of an application to the Board for a waste importation per-

mit, the applicant shall schedule a public hearing on the application. The applicant must publish notice of its application and of the date, time, location, and purpose of the public hearing in a newspaper of general circulation serving Monroe county at least once per week for two weeks preceding the date of such hearing. One or more qualified representatives of the applicant must appear at and conduct the hearing, must make a complete copy of the application available for review by those in attendance, and must make every reasonable effort to provide information pertinent to the application that may be requested by those in attendance. No action will be taken by the Board on an application unless the requirements of this subsection have been satisfied.

(f) *Standards for Decision.* In determining what action to take on an application for a waste importation permit, the Board will consider and balance all information presented to the Board by the applicant, all information and comments presented by the citizens of Monroe County and other interested persons, and any additional information or factors deemed by the Board to be relevant to its decision. With respect to every such application, the Board will consider without limitation the following:

(1) Whether the proposed waste importation would consume landfill space that is or will be needed for the disposal of waste generated and/or collected in Monroe County;

(2) Whether the proposed waste importation could adversely affect the health or general well-being of the people of Monroe County;

(3) Whether the proposed waste importation could diminish or degrade the quality of Monroe County's air, soil, water, and other natural resources and environment;

(4) Whether the proposed waste importation would conflict with Monroe County's short-term or long-term land use plans;

(5) Whether the proposed waste importation would conflict with any solid waste management plan adopted by Monroe County;

(6) Whether the proposed waste importation would conflict with any statute, rule, regulation, or other law, or with any court order, or with the conditions of any solid waste handling permit, or with the approved design and operation plan for the landfill in which the imported waste would be disposed;

(7) Whether the proposed waste importation would place an unreasonable, excessive, or disproportionate burden on the road maintenance and other public services and public facilities provided by Monroe County.

(g) *Permit Fee and Reporting Requirements.*

(1) Each holder of a waste importation permit shall pay to Monroe County a fee of $5.00 for each ton of imported waste transported into Monroe County pursuant to that permit. Payment of that fee shall be made quarterly and must accompany the report required by subsection (b).

(2) Each holder of a waste importation permit shall submit a verified written report to the Board within ten (10) days after the close of each calendar quarter. That report shall identify by exact dates the period covered by the report, all counties from which imported waste was collected during the reporting period, the tonnage of imported waste collected from each county, and the total tonnage of imported waste collected from each county, and the total tonnage of imported waste transported into Monroe County during the reporting period.

(h) *Revocation of Permit.* A waste importation permit may be revoked by the Board for any good cause, which shall include without limitation a finding by the Board that (1) the holder of the permit, or any person acting on the holder's behalf, has violated the terms of the permit, (2) the

holder, or any person acting on the holder's behalf, has violated any other waste handling permit or any environmental law, (3) the holder has failed timely to submit any quarterly report required under Section 11–20(g)(2), or that any such report contains false information, (4) the holder has failed timely to make payment in full of the quarterly permit fee, (5) the holder has been convicted of a felony or of violation of any environmental law or of any other crime involving moral turpitude, or (6) the holder's permit application contained false information or omitted material information.

NOW, THEREFORE, IT IS HEREBY RESOLVED by the BOARD OF COMMISSIONERS OF MONROE COUNTY, GEORGIA, that the Code of Ordinances, Monroe County, Georgia, be amended as set out hereinabove, and the Clerk of this Commission is directed to enter said amendment to the Code upon the Minutes pursuant to O.C.G.A. § 36–10–1.

SO RESOLVED, this 30 day of October, 1991.

BOARD OF COMMISSIONERS OF MONROE COUNTY, GEORGIA

/s/ Thomas H. Wilson

THOMAS H. WILSON—Chairman

/s/ James V. Ham

JAMES V. HAM—Member

/s/ Larry C. Evans

LARRY C. EVANS—Member

/s/ Brenda U. Harmon

BRENDA U. HARMON—Member

/s/ Joe W. Proctor, Sr.

JOE W. PROCTOR, SR.—Member

ATTEST:

/s/ Curtis Jenkins

CURTIS JENKINS—Clerk