**BFI WASTE SYSTEMS OF NORTH AMERICA, Plaintiff,**

v.

**DEKALB COUNTY, GEORGIA, a political subdivision of the State of Georgia; the DeKalb County Board of Commissioners; Vernon Jones, DeKalb County Chief Executive Officer; and Elaine C. Boyer, Gale Walldorff, Jacqueline Scott, Henry Johnson, Judy Yates, Burrel Ellis, and Lou Walker in their individual capacities as Members of the DeKalb County Board of Commissioners, Defendants.**

No. 1:02–CV–0922–RWS.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 16, 2004.

---

George Douglas Dillard, Andrea Cantrell Jones, Dillard & Galloway, Atlanta, GA, for Plaintiff.

Charles George Hicks, William J. Linkous, III, Howard Walter Indermark, E. Charles Reed, Jr., Office of DeKalb County Attorney, Decatur, GA, for Defendant.

## *ORDER*

STORY, District Judge.

Plaintiff BFI Waste Systems of North America ("BFI") filed this case alleging that Defendants, DeKalb County ("the County"), the County CEO, and the County Commissioners, violated federal and state law in connection with their zoning decisions. BFI originally filed this suit in the Superior Court of DeKalb County, Georgia. Defendants removed the case to this Court pursuant to 28 U.S.C. §§ 1441(b) and 1446. With the exception of two claims discussed *infra* Part III.A.1., this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Now before the Court for consideration are Defendants' Motion for Summary Judgment [26–1] and Motion to Strike the Written Report of Plaintiff's Engineer [38–1]. After considering the entire record, the Court enters the following Order.

## Factual Background

The following facts are undisputed unless otherwise noted. BFI is a nationwide business that develops and operates landfills and solid waste disposal facilities throughout the United States. BFI owns more than 148 acres of real property in the southern portion of DeKalb County, Georgia; it opened the Hickory Ridge landfill there in 1992.[1] BFI anticipated that the life span of the landfill would be about twelve years, until approximately 2004. Hickory Ridge was designed in conformance with federal and state regulations as they existed in 1992, and was optimized so that the site met all applicable rules.[2]

At the time of the initial construction of Hickory Ridge, the property was zoned to the "M" classification under the DeKalb County Code. At that time, landfills were a permitted use under the "M" classification. In April 1999, DeKalb County adopted a new Zoning Ordinance. The new Ordinance included "M" and "—2" classifications; landfills were not listed as permitted uses in either classification. DeKalb County, Ga., Code of Ordinances §§ 27–618("M"), –638 ("—2"). Instead, landfills were allowed to operate as special uses on land classified as "—2," only if the owners obtained Special Land Use Permits ("SLUPs"). Id. § 27–640. Because Hickory Ridge existed prior to 1999, it was permitted to continue to operate as a nonconforming use. Id. §§ 27–5, –937.

BFI decided to modify its current design to allow a vertical expansion of the Hickory Ridge landfill, which would extend the life of the landfill for as many as eight years. According to BFI's expert, Frank S. Gray, such an expansion would have yielded approximately $473 million in additional gross revenue. (Pl.'s Ex. H (Gray Report, Executive Summary).) In order to obtain permission from the State for the vertical expansion, BFI needed a letter from DeKalb County stating that the property complied with local zoning ordinances.[3] To come into compliance, BFI submitted applications to DeKalb County to rezone the property from the "M" classification to the "—2" classification and to obtain a SLUP, in September 2001.

On February 26, 2002, Defendants held a public hearing concerning BFI's applications. The Planning Department had recommended approval of BFI's rezoning application, with some conditions, based on the location of the landfill and the surrounding land use. (Maxey Dep. at 36; Tr. at 22.)[4] At the hearing, however, several residents living near Hickory Ridge complained of offensive odors at their homes. (Tr. at 7, 14.) Many members of the public spoke in opposition to the expansion, citing quality of life, health, property value, and environmental justice concerns. The Commissioners also heard testimony on the potential negative impacts of landfills, read aloud a letter from then-Congressperson Cynthia McKinney,

1. There are three municipal solid waste landfills in the County: Hickory Ridge, Live Oak (operated by Waste Management), and the County-owned Seminole Road Landfill. Hickory Ridge and Live Oak are in industrial areas, while Seminole Road is located in a residential area.

2. Hickory Ridge is a Subtitle D landfill under the Resource Conservation and Recovery Act (RCRA). The Subtitle D standards were issued in 1991 under the Hazardous and Solid Waste Amendments to RCRA. See 42 U.S.C. §§ 6941–49a.

3. A detailed discussion of this procedure is set forth infra Part III.A.3.

4. The record before the Court includes a transcript and videotape of the public hearing on BFI's Rezoning Application and SLUP Application held February 26, 2002. The Court cites to the transcript as "Tr. at ___."

who expressed concerns about environmental justice, and considered research on landfills' environmental impacts. (*See, e.g.,* Tr. at 38–48 (testimony), 65–65 (letter), 68–70 (research).) The Commission voted to deny the rezoning application and thereafter denied the SLUP request. (Tr. at 93, 103.)

Based on the proceedings of the hearing, Defendants explain that the Commission denied BFI's application in part to provide protection to Georgia's ground water. (Tr. at 85.) BFI contends, however, that the Board relied on faulty, outdated, and irrelevant information and orchestrated a case against the application at the public hearing. (BFI's Resp. to Defs.' Statement of Undisputed Facts ¶ 26 [hereinafter BFI's Resp. to Facts].) BFI states that Defendants had no credible evidence before them to conclude that the Hickory Ridge landfill posed any threat to ground water. (*Id.* ¶ 27) In contrast, BFI has presented evidence to show that the County's own landfill, Seminole Road, has exceeded acceptable methane concentrations in its monitoring wells on several occasions. (Scott Dep. at 15–16.)[5] BFI also notes that the Georgia Environmental Protection Division ("EPD") has responded to odor complaints attributed to Hickory Ridge, but upon investigation, has not found that the offensive odors have come from Hickory Ridge. (Pl.'s Ex. F (Arcadis Benefits Evaluation Study at 7–8).) Finally, BFI contends that public statements made at the meeting indicated Defendants' intent to eliminate private landfills through the local government's regulatory powers and monopolize the solid waste market in the DeKalb County region. (*See* Tr. at 93 (Ms. Yates: "[P]rivate ownership creates

problems .... There is nothing wrong with government ownership of landfills.").)

Although its applications were denied, Hickory Ridge continues to operate as a municipal solid waste landfill; DeKalb County has not imposed any restrictions on the tonnage coming into the landfill. (Kauffman Dep. at 71.) Nevertheless, as a result of being unable to expand, BFI has chosen to reduce the volume going into the landfill to try to lengthen its life. (*Id.*) The parties agree that all landfills eventually reach capacity. When the Hickory Ridge landfill closes, BFI plans to take its waste to another landfill in Georgia, in either Buford or Taylor County. BFI contends that having to take the waste to its other landfills will require price increases which will put its contracts at risk. (*Id.* at 57.) Further, BFI submits that it can no longer compete in the DeKalb County waste disposal market and it anticipates losing customers as a result of increased transportation costs. (*Id.* at 57.) Even so, the parties agree that DeKalb's denial of BFI's application has not caused BFI to lose any of its existing contracts or customers.

DeKalb County has no authority over any contracts BFI has with other counties, nor has the County indicated it wants to cancel any of BFI's currently existing contracts. (*Id.* at 72.) DeKalb County uses its Seminole Road landfill solely for DeKalb County municipal solid waste and does not accept waste from any other source. In contrast, less than ten percent of the waste taken into the Hickory Ridge landfill comes from within the physical boundaries of DeKalb County. Defendants' Solid Waste Management Plan calls

---

5. BFI's citation to the Michael Dep. at 20 does not support this contention. Numerous of BFI's citations to record evidence do not support the propositions for which they are cited. Although the Court has attempted to locate such evidence, it is not the Court's duty to comb the record to attempt to find reasons to deny a motion for summary judgment. *Powers v. CSX Transp., Inc.,* 190 F.Supp.2d 1284, 1286 n. 2 (S.D.Ala.2002).

for no new permits to be granted for land-filling of municipal solid waste during a ten-year period or until a need arises. (Michael Dep. Ex. 2 at IX–9.) BFI contends that by enacting the Zoning Ordinance and denying BFI's application, the County took "initial steps which will enable the County to take BFI's business in the future." (Pl.'s Resp. to Facts ¶ 35.)[6]

Since the County enacted its Zoning Ordinance in 1999, no waste company other than BFI has applied for a rezoning of its landfill site from "M" to "M–2." Nor has any landfill site been rezoned from "M" to "M–2" since that time. Prior to 1999, however, Waste Management applied for and obtained a vertical expansion permit for Live Oak landfill. Defendants explain that because Waste Management's application was made prior to the 1999 Zoning Ordinance, Waste Management was in compliance with then-current zoning laws and did not need to request a rezoning.[7] According to Defendants, had BFI also sought a vertical expansion from the State prior to April 1999, there would have been no need to seek a rezoning from DeKalb County because the Hickory Ridge landfill would have been in compliance with then-current zoning laws. (Kaufmann Dep. at 45–47.)[8] BFI, however, points to a letter from Raymond R. White, Planning Director of DeKalb County, to James Dun-

bar, Program Manager of the EPD's Solid Waste Management Program dated February 2, 1999 ("the February 2 letter"), certifying that Waste Management's landfill "is a legal nonconforming use (under DeKalb County's zoning and land use ordinances) as it exists today." (Pl.'s Ex. B.) BFI emphasizes that although EPD rules require a reaffirmation of the verification of zoning, DeKalb County never issued such a reaffirmation. On August 3, 1999, the EPD issued a permit to Waste Management for the vertical expansion of its landfill. (Pl.'s Ex. C.)

BFI makes the following claims: (1) violation of the takings prohibitions in the Fifth Amendment to the U.S. Constitution and Article I, Section 3, Paragraph 1 of the Georgia Constitution and the remedy of inverse condemnation for which compensation is due; (2) violations of the substantive due process protections in the Fourteenth Amendment to the U.S. Constitution and Article I, § 1, ¶ 1 of the Georgia Constitution; (3) violations of the Equal Protection Clauses of the U.S. Constitution and Article I, § 1, ¶ 2 to the Georgia Constitution; (4) violations of the dormant Commerce Clause of the U.S. Constitution; and (5) violations of the Sherman Act, 15 U.S.C. § 2, *et seq.* BFI seeks declaratory and injunctive relief,

---

6. Although the parties appear to dispute whether BFI and DeKalb County compete, the evidence to which BFI cites suggests-contrary to BFI's assertion-that the two entities do *not* compete. (*See* Malone Dep. at 46 ("We do not compete.").) Indeed, Defendants cite that same testimony in support of its assertion that the entities do not compete. (*See also* Carpenter Dep. at 54 (Seminole Road landfill takes trash only from within DeKalb County); Kaufmann Dep. at 62 (Seminole Road landfill is not in competition with BFI "as of this moment").)

7. The deposition testimony cited by Defendants for this explanation supports only the fact that Waste Management's application

was made prior to the Zoning Ordinance's adoption; the testimony does not explain that Waste Management's site was in compliance with then-current zoning laws. (*See* Gray Dep. at 21; Malone Dep. at 89.) *See supra* n. 4 (court need not comb record).

8. BFI denies this statement in its Response to Defendants' Statement of Facts but provides no explanation of its denial and does not cite any supporting evidence. Local Rule 56.1B(2) provides, "[a]ll material facts contained in the moving party's statement which are not specifically controverted by the respondent in the respondent's statement shall be deemed to have been admitted." N.D. Ga. Local R. 56.1B(2).

just compensation, and a writ of mandamus.

## Discussion

■ Defendants have moved for summary judgment on all of BFI's claims. In ruling on a motion for summary judgment, a court may consider only evidence that would be admissible at trial. *White v. Wells Fargo Guard Servs.*, 908 F.Supp. 1570, 1577 (M.D.Ala.1995). However, evidence produced for summary judgment need not be in an admissible form if it could be reducible to admissible form for trial. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1444 (11th Cir. 1991). Before reaching the Motion for Summary Judgment, therefore, the Court considers Defendants' many objections to BFI's evidence.

## I. Defendants' Motion to Strike

■ Defendants move to strike the written report of BFI's expert, engineer Frank L. Gray. Mr. Gray's deposition took place on November 8, 2002, but BFI did not turn over its expert's report until more than four months after the deposition and after Defendants filed their Motion for Summary Judgment. Defendants contend that Mr. Gray offered many opinions in his written report on matters for which he specifically denied knowledge during his deposition. Further, they contend that Mr. Gray's report offers several opinions without any indication of the sources of information upon which those opinions were based.

BFI responds that although Mr. Gray's report is dated January 20, 2003, BFI did not receive the report until March 30, 2003. BFI immediately sent a copy of the report to Defendants. Because Defendants have not sought to redepose Mr. Gray and the case has not yet been scheduled for trial, BFI argues that Defendants have not been prejudiced by new material in the report. Finally, BFI notes that as an expert, Mr. Gray may testify in terms of his opinion without testifying to the underlying facts. BFI states that Mr. Gray's opinions are based on his professional experience and documents in the record.

Federal Rule of Civil Procedure 26(a)(2)(A) requires parties to disclose the identity of any expert who may testify at trial. This disclosure must be accompanied by a written report containing, *inter alia*, all opinions to be expressed, and the reasons and bases for those opinions. Fed.R.Civ.P. 26(a)(2)(B). The Local Rules require parties to designate their experts sufficiently early "to permit the opposing party the opportunity to depose the expert witness sufficiently in advance of the close of discovery." N.D. Ga. Local R. 26.2C. The Federal Rules specify that in absence of directions from the court or stipulation by the parties, "the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial." Fed.R.Civ.P. 26(a)(2)(C).

The facts here are distinguishable from those in *Williams v. Roberts,* 202 F.R.D. 294 (M.D.Ala.2001), upon which Defendants rely. There, the plaintiffs filed a motion in limine to exclude the testimony of three defense witnesses who planned to testify about groundwater and toxicology. *Id.* at 295. The court held that the first witness was an expert, and because he had not been disclosed at all, would not be allowed to testify. *Id.* at 296. The second two expert witnesses produced written reports without providing the studies, materials, or tests upon which they had based their opinions. *Id.* Only later-after the case had been called to trial-did the defendants turn over "an avalanche of papers" with the general explanation that these papers provided the bases for the experts' reports. *Id.* The court reasoned that the defendants had not met

their disclosure obligations by providing the extra information without any guidance. *Id.* More importantly, the court found that the defendants knew about the additional information "long before it was disclosed." *Id.* at 297. As the court explained, these "litigation tactics" worked "profound prejudice" on the plaintiffs and left the plaintiffs guessing as to what the experts' testimony would be. *Id.* Thus, the court limited the experts' testimony to what had already been disclosed. *Id.*

Unlike the disclosures in *Williams,* Mr. Gray's report was provided to Defendants as soon as it became available. Although the report came late-after Defendants had moved for summary judgment-Defendants have not shown that they are prejudiced by the report's untimeliness. Defendants did not seek to redepose Mr. Gray or otherwise address the report in their Reply. Nor have Defendants argued that Mr. Gray is not qualified as an expert or that they need additional time to evaluate whether his methods are sound. Indeed, BFI timely identified Mr. Gray as an expert witness, but there is no indication Defendants ever intended to introduce their own expert to rebut Mr. Gray's testimony. All of these factors lead the Court to conclude that the expert report need not be excluded. Thus, the Court hereby **DENIES** Defendants' Motion to Strike the Written Report of Plaintiff's Engineer [38–1]. To the extent that Defendants' arguments center on the admissibility of material in the report, however, the Court considers those objections below.

## II. Evidentiary Objections

### A. Expert Report

Defendants raise several objections to the content of the expert report by Mr. Gray (Pl.'s Ex. H). The Court's rulings are set forth below; the numbers below correspond to the numbered paragraphs detailing Defendants' objections. (*See* Notice of Objections [40–1].)

■ **1.** The statement, "the county commissioners through their own testimony and delivery of witnesses and information presented at the public hearing appeared to be presented in a fashion to substantiate an emotional denial of the fact that all activities completed by BFI ... is [sic] completed within the permitted guidelines ...." is outside the scope of this expert's knowledge and speculative.

**2.** As an expert, Mr. Gray is entitled to state that "[s]mall traces of contaminants within the presented wells are very typical ...."

**3, 4, 5, 6.** To the extent that the second paragraph on page two of the report (beginning "Due to the change ...") attempts to describe the application of the County's land use ordinances to Hickory Ridge, Mr. Gray does not appear to have the qualifications necessary for the admissibility of such opinions. The Court makes the same finding with respect to the sentence "[t]his application ... completely and adequately outlined the required zoning conditions ...." However, Mr. Gray may give his opinions as to what BFI would need to do to apply for a rezoning application and BFI's ability to operate its facility.

**7, 8, 9.** To the extent Mr. Gray opines as to "the fact that the Planning Department did not possess the required technical expertise," and the idea that "Planning Departments are not typically staffed with registered professional engineers ..." the Court finds that Mr. Gray is not qualified to testify as to the operation of Defendants' Planning Department. The Court makes the same finding with respect to the sentence, "Furthermore, should the same request be made by DeKalb County of [sic] their own Seminole Road Facility, I would expect the same results of the Planning Department."

10, 11. Based on the record before it, the Court is unable to determine the admissibility of the statements to which Defendant objects in paragraphs ten and eleven. For purposes of the pending Motion for Summary Judgment only, the Court will not disregard these statements.

12. Mr. Gray is qualified to testify that elevated methane levels are "to be expected."

13, 14. Mr. Gray is qualified to testify about financial considerations and the Atlanta market's practice of typically charging on a per-ton basis.

15, 16, 17, 18. Mr. Gray's reference to a recent survey is allowable. *See* Fed. R.Evid. 703. The Court notes that Defendants have not challenged Mr. Gray's methodology or requested a copy of the recent survey upon which Mr. Gray relied. Similarly, Mr. Gray's conversion of airspace volume to total pounds and realizable gross revenue is permissible. *Id.*

**B. Documents**

■ Defendants object to several of BFI's Exhibits on various grounds. As to Defendants' objection that Exhibits A–E, G, and H were not authenticated, the matter appears to be resolved for all of these exhibits except Exhibit D. Exhibits A–C and E have been re-filed with certification from their records custodian.[9] (*See* Pl.'s Notice of Filing [47–1].) BFI states that Exhibit G was produced by Defendants' witness Tommy Malone with permission of Defendants' counsel. BFI has submitted a verification of Exhibit H. (Pl.'s Resp. to Notice of Objection [46–1] Ex. A (verifying expert report).) Exhibit D, however, has not been authenticated. Accordingly, the Court excludes it from consideration. *See Burnett v. Stagner Hotel Courts, Inc.*, 821 F.Supp. 678, 683 (N.D.Ga.1993) (docu-

ments must be properly authenticated in order for them to be considered on summary judgment).

■ Defendants further object to Plaintiff's Exhibits A–E, stating that BFI disclosed these documents on May 7, 2003, well after the close of discovery. Moreover, Defendants argue that BFI failed to supplement its discovery responses with respect to these documents. BFI responds that it did not obtain these exhibits until shortly before its Response to Defendants' Motion for Summary Judgment; moreover, it contends these documents are in Defendants' possession in connection with the approval of Live Oak landfill's vertical expansion and so they cannot prejudice Defendants in any way.

As to Exhibits A and C, it is not apparent on the face of the documents why Defendants would already have had the documents in their possession. However, the Court sees no prejudice in these documents; they are relevant to show that the Live Oak Landfill was permitted for a vertical expansion, a fact that is undisputed.

Exhibits B and E are copies of letters sent by County officials in connection with Waste Management's attempt to obtain a vertical expansion permit for Live Oak landfill. BFI relies on Exhibit B ("the February 2 letter") to show a dispute as to whether Live Oak landfill was a "legal nonconforming use" prior to the enactment of the 1999 Zoning Ordinance. (*See infra* Part III.A.3.) As discussed below, however, the parties' differing characterizations of Live Oak's pre–1999 Zoning Ordinance status do not amount to a dispute of *material* facts. Thus, there is no prejudice to Defendants in admitting this Exhibit. As

---

9. BFI has re-filed these exhibits using different exhibit letters than those accompanying its Response to Defendants' Motion for Summary Judgment. To avoid confusion, the Court refers to the exhibits according to the exhibit letters in the Response.

to Exhibit E, this letter supports undisputed facts and there is no prejudice to Defendants in its admission.

## III. Motion for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## A. Constitutional Claims

BFI's constitutional claims implicate takings, substantive due process, equal protection, and the dormant Commerce Clause.[10]

### 1. Takings, Inverse Condemnation, and Ripeness

 BFI contends that Defendants' denial of BFI's request to rezone constitutes a regulatory taking in violation of the U.S. and Georgia Constitutions. BFI claims that Defendants' actions constituted inverse condemnation of its property and it is entitled to just compensation. Although no party raises the issue, the Court finds that it does not have jurisdiction of these claims because they are not ripe.[11]

 A regulation "restricting the use of property may in some limited circumstances amount to a taking." *Rymer v. Douglas County*, 764 F.2d 796, 800 (11th Cir.1985). To show a constitutional violation, a plaintiff must prove that the challenged regulation denied the property owner of any viable economic use of the property. *Id.; see also Lucas*, 505 U.S. at 1015, 112 S.Ct. 2886. "In other words, the

10. In *Eide v. Sarasota County*, 908 F.2d 716 (11th Cir.1990), the Eleventh Circuit described four categories of challenges a plaintiff might bring with respect to a zoning ordinance and land use: "just compensation, due process takings, arbitrary and capricious due process, and equal protection claims." *Id.* at 720. This description produced some confusion about the meaning of "due process taking." *See Villas of Lake Jackson, Ltd. v. Leon County*, 906 F.Supp. 1509, 1513–1515 (N.D.Fla.1995) (describing source of confusion and subsequent history). Following *Eide*, the U.S. Supreme Court decided *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), and evaluated a regulatory taking claim only as a Fifth Amendment takings claim. *Id.* at 1014–16, 112 S.Ct. 2886. Thereafter, the Eleventh Circuit clarified that "[t]here is no independent 'substantive due

process taking' cause of action. The only substantive due process claim is for arbitrary and capricious conduct." *Villas of Lake Jackson, Ltd. v. Leon County*, 121 F.3d 610, 612 (11th Cir.1997). Nevertheless, some courts and the parties here occasionally echo the old "substantive due process takings" language; to the extent that BFI argues such a claim, the Court treats it according to the standards for Fifth Amendment takings claims.

11. Because this is a court of limited jurisdiction, the Court must inquire into the existence of subject matter jurisdiction *sua sponte*, even though the parties have not challenged it. *Rembert v. Apfel*, 213 F.3d 1331, 1334 (11th Cir.2000). Ripeness is an issue of subject matter jurisdiction. *Reahard v. Lee County*, 978 F.2d 1212, 1213 (11th Cir.1992); *Boyce v. Augusta–Richmond County*, 111 F.Supp.2d 1363, 1381 (S.D.Ga.2000).

governmental action must have made the property worthless." *Agripost, Inc. v. Miami–Dade County ex rel. Manager*, 195 F.3d 1225, 1231 (11th Cir.1999). In addition, a property owner must show either that state law provides no process for obtaining just compensation, or that state law is inadequate due to state court interpretation. *Id.* If the plaintiff cannot show either of these latter requirements, the case is not ripe and the court lacks subject matter jurisdiction over the claim. *Id.;* see also *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). In Georgia, state law provides a process for obtaining just compensation for takings resulting from zoning decisions: claimants may bring an action for inverse condemnation. *James Emory, Inc. v. Twiggs County*, 883 F.Supp. 1546, 1556 (M.D.Ga.1995); *Benton v. Savannah Airport Comm'n*, 241 Ga. App. 536, 525 S.E.2d 383, 386 (1995). Thus, where a plaintiff has not availed itself of the state-law process, takings and inverse condemnation claims are not ripe for federal court review. *Eide v. Sarasota County*, 908 F.2d at 720–21; *James Emory, Inc.*, 883 F.Supp. at 1557.

Here, BFI first filed this case in the Superior Court of DeKalb County, Georgia. Defendants removed the case to this Court. Because BFI has not been able to pursue its inverse condemnation claim in state court, this Court lacks jurisdiction over the takings and inverse condemnation claims. However, because these claims are before the Court following a removal, the appropriate action is to remand those claims to the state court. *See generally Milliken v. Town of Addison*, 2002 WL 31059802 (N.D.Tex. Sept. 13, 2002) (granting plaintiff's motion to remand inverse condemnation and takings claims that were not ripe); *cf. James Emory, Inc.*, 883 F.Supp. at 1557 (granting defendants' motion for summary judgment on takings and inverse condemnation claims that plaintiff filed in federal district court).[12]

On remand, the parties may consider making a *Jennings* reservation of the federal takings claim for federal court adjudication. *Jennings v. Caddo Parish Sch. Bd.*, 531 F.2d 1331 (5th Cir.1976); see *Fields v. Sarasota Manatee Airport Auth.*, 953 F.2d 1299, 1306–07 (11th Cir.1992) (acknowledging analytical problems with *Jennings* but nevertheless holding *Jennings* reservation may be made in takings cases); *Treister v. City of Miami*, 893 F.Supp. 1057, 1071, 1071 n. 10 (noting lack of authority whether defendant may make *Jennings* reservation but suggesting either party could do so where defendants had removed case to federal court and state claims had been remitted); see also *England v. La. State Bd. of Med. Examiners*, 375 U.S. 411, 422 n. 13, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) (noting that either party may make similar *England* reservation because not only does a plaintiff have the right to litigate federal claims in federal court, but a defendant has the same right by virtue of the removal process).

In light of the right to preserve the federal takings claim for adjudication in

---

12. Some courts appear to treat substantive due process and equal protection claims arising out of the same facts as takings or inverse condemnation claims as similarly unripe. *E.g., Deniz v. Municipality of Guaynabo*, 285 F.3d 142 (1st Cir.2002). While the Eleventh Circuit has not given explicit guidance, the Court believes it most consistent with the ripeness and jurisdictional principles discussed in *Eide* to retain jurisdiction of those federal claims properly before it (and related state claims) and remand only those that are not ripe for this Court's review. *See generally James Emory, Inc.*, 883 F.Supp. 1546 (granting defendants' motion for summary judgment on unripe just compensation claims but considering plaintiff's other claims separately).

Eu

this Court, this action will remain open until this matter is resolved. Accordingly, the Court hereby **REMANDS** BFI's claims of takings under the Georgia and U.S. Constitutions, and inverse condemnation, to the Superior Court of DeKalb County, Georgia. The Clerk is **DIRECTED** not to close this case until further Order of this Court. The parties are **ORDERED** to submit a status report to this Court within six months of the date of entry of this Order.

### 2. Substantive due process

■■■ BFI alleges that Defendants' denial of the applications was arbitrary and capricious in violation of its substantive due process rights under the federal and state constitutions.[13] Zoning ordinances are entitled to a presumption of constitutionality if the validity of the zoning classification is fairly debatable. *Euclid v. Ambler Realty*, 272 U.S. 365, 388, 47 S.Ct. 114, 71 L.Ed. 303 (1926). "This presumption flows out of the recognition that the local legislative body is more familiar with local conditions and thus in a better position than the courts to determine the nature and scope of necessary regulation." *Rumpke Waste, Inc. v. Henderson*, 591 F.Supp. 521, 525 (S.D.Ohio 1984) (citation omitted). "[F]ederal courts do not sit as zoning boards of review and

should be most circumspect in determining that constitutional rights are violated in quarrels over zoning decisions." *Spence v. Zimmerman*, 873 F.2d 256, 262 (11th Cir. 1989) (citations omitted); *see also Greenbriar Village, LLC v. Mountain Brook*, 345 F.3d 1258, 1262 (11th Cir.2003). Thus, this Court does not have the authority to "weigh and reappraise the factors considered or ignored by the legislative body in passing the challenged zoning [decision]." *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1389 (11th Cir.1993).

■■■ The substantive component of the Due Process Clause prohibits a government entity from applying a zoning classification that bears no relationship to "public health, safety, morals, or general welfare." *Euclid*, 272 U.S. at 395, 47 S.Ct. 114. In this context, a substantive due process claim may be established by showing "deprivation of a property interest for an improper motive and by means that were pretextual, arbitrary and capricious, and ... without any rational basis." *Spence*, 873 F.2d at 258.

### a. BFI's property interest

■■■ As the standard above reflects, BFI must first establish that it had a valid property interest in some benefit protectable by the Fourteenth Amendment at the time of the alleged deprivation. *Id.; see Greenbriar Village*, 345 F.3d at 1264.[14]

---

13. For purposes of the summary judgment motion, BFI's argument focuses only on federal constitutional standards. It thus appears that BFI has abandoned the state constitutional claim. Even if BFI has not abandoned this claim, the relevant analysis under the Georgia Constitution is similar to that for the U.S. Constitution and the Court reaches the same result with respect to any state substantive due process claim. *See Georgia Dep't of Human Res. v. Sweat*, 276 Ga. 627, 580 S.E.2d 206, 210 (2003) (describing rational basis test "for both the Georgia and United States Constitutions' guarantees of substantive due process.").

14. For purposes of this discussion, the Court presumes that the denials of the zoning and SLUP applications constituted legislative decisions. *Cf. Greenbriar Village, L.L.C. v. Mountain Brook*, 345 F.3d at 1263 (11th Cir. Sept.18, 2003) ("non-legislative deprivations of state-created rights, which would include land-use rights, cannot support a substantive due process claim"). Because Defendants applied the Zoning Ordinance to a specific entity for a specific parcel of land (as opposed to creating a law with general applicability), it seems likely that their decisions were executive or administrative rather than legislative. *See Crymes v. DeKalb County*, 923 F.2d 1482,

Courts look to state law to identify property interests. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (property interests are not created by the Constitution but stem from an independent source such as state law); *DeKalb Stone, Inc. v. County of DeKalb*, 106 F.3d 956, 959 (11th Cir.1997) ("It is well established that land use rights, as property rights generally, are state-created rights.").

Defendants argue that BFI does not have a property interest in having its property rezoned. Citing *Banks County v. Chambers of Ga., Inc.*, 264 Ga. 421, 444 S.E.2d 783 (1994), Defendants contend that because BFI cannot show that it has a legitimate claim of entitlement to rezoning, it does not have a constitutionally protected property interest. In *Banks County*, the Georgia Supreme Court held that an applicant for a proposed solid waste landfill has a vested right to written verification of compliance with local zoning ordinances if the applicant is in compliance with such ordinances when the applicant first requests written verifications. *Id.* at 786. *Banks County* is consistent with other Georgia authority holding that a landowner is entitled to a permit where (a) the owner complies with all requirements and (b) the local government has no discretion to deny the permit. *See Gifford–Hill & Co. v. Harrison*, 229 Ga. 260, 191 S.E.2d 85, 89 (1972) (zoning commission did not have discretion to deny conditional use permit to applicant who wished to use property as permitted in particular zone at time application was submitted); *cf. Dougherty County v. Webb*, 256 Ga. 474,

350 S.E.2d 457, 459 (1986) (while certain objective conditions must be satisfied before applicant is granted special approval for proposed land use, ultimate decision whether to issue approval is left to discretion of commission). *But see Cohn Communities, Inc. v. Clayton County*, 257 Ga. 357, 359 S.E.2d 887, 889 (1987) (where landowner makes substantial change in position in reliance upon probability of issuance of building permit, based upon existing zoning ordinance and assurances of zoning officials, he acquires vested rights and is entitled to have permit issued despite change in zoning ordinance which would otherwise preclude issuance of permit).

 Here, Defendants do not contend that BFI failed to submit the appropriate applications for the rezoning or SLUP. Nor does BFI argue that Defendants had no discretion to deny the rezoning; indeed, a review of the Zoning Ordinance reveals that approval was not mandatory. *See, e.g.*, DeKalb County, Georgia, Code of Ordinances § 27–841 (commissioners may approve or deny applications based on consideration of enumerated standards); *see also Dougherty County v. Webb*, 350 S.E.2d at 459 (determining that similarly worded ordinance conferred discretion). Mere "abstract need or desire" for a benefit will not create a protectable property interest; instead there must be a "legitimate claim of entitlement" to the expected benefit. *Roth*, 408 U.S. at 577, 92 S.Ct. 2701. Here, BFI cannot show that it was entitled to have its property rezoned. It therefore cannot point to a protectable property interest.

1485–86 (11th Cir.1991) (legislative acts are characterized by their policy-making functions and general applicability; in contrast, application of existing policies to specific individuals on specific facts is not considered legislative but is instead administrative); *see also DeKalb Stone, Inc. v. County of DeKalb*, 106 F.3d 956, 959 (11th Cir.1997) ("enforce-

ment of existing zoning regulations is an executive, not legislative, act"). In that case, BFI would be limited to making a procedural due process claim. *Greenbriar Village*, 345 F.3d at 1262–63. In an abundance of caution, the Court considers BFI's claims as though Defendants' decisions were legislative.

BFI argues, however, that the property interest at stake is the right to dispose of waste in a landfill. Citing *Bass Plating Co. v. Town of Windsor,* 639 F.Supp. 873 (D.Conn.1986), BFI contends that it has a constitutionally protected interest in disposing of waste. *Bass Plating* is not helpful because there, the defendant towns had already conferred upon the plaintiffs a right to dispose of industrial waste in the regional landfill; *whether* there was a protected property interest was not at stake. *Id.* at 879. Moreover, it is undisputed here that Defendants' denial did not have any effect on BFI's right to operate its landfill now within the parameters defined by its existing permits and the law. The action of which BFI complains is Defendants' failure to rezone Hickory Ridge so that BFI could seek permission from the State to vertically expand its landfill in the future. This "property interest" is illusory and cannot support a substantive due process claim.

### b. Arbitrariness and capriciousness

 Even if BFI claims some constitutionally protected property interest, Defendants' denial of its applications was not arbitrary and capricious as a matter of law and so did not amount to a substantive due process violation. "The relevant question for consideration is whether there existed a rational basis for [the denial] or, phrased in the alternative, whether the . . . action bore no substantial relation to the general welfare." *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1577 (11th Cir.1989).

BFI argues that "[t]here is a dispute as to whether the Zoning Ordinance actually accomplishes its purpose of protecting public interests or that these interests in

this case are genuine." (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 12.) BFI takes issue with the particular information upon which the Commissioners relied in denying the applications. For example, some of the reports referenced at the public hearing were produced before the RCRA Subtitle D design requirements were implemented; these reports should not apply to Hickory Ridge, BFI argues, because it was designed in accordance with Subtitle D standards. As another example, BFI notes that the odor issues cited by residents were merely unsubstantiated allegations, and the County's own Seminole Road landfill has ground water contamination problems. Moreover, BFI contends that it will have to reroute waste to other jurisdictions, which will cause additional burdens on air quality and roads and require increased energy consumption.

BFI is asking this Court to "weigh and reappraise the factors considered or ignored" by the Defendants. *Corn v. City of Lauderdale Lakes,* 997 F.2d 1369, 1389 (11th Cir.1993). This the Court may not do. *Id.* Moreover, the record makes clear that Defendants had a rational basis for denying the applications. They heard testimony from individuals about the potential negative impact of landfills on ground water; they considered environmental justice issues and the impact of landfills on residential areas; they referenced reports that had been completed before *and* after the adoption of the Subtitle D standards; and they took into consideration complaints of residents about odors. These concerns reveal that, as a matter of law, it was rational for Defendants to believe that denying the applications would serve the legitimate public purposes of protecting the health and safety of DeKalb County citizens.[15]

---

15. Moreover, to the extent that Defendants responded or reacted to general public opposition, this fact alone is not enough to create a substantive due process issue. In *Greenbriar,*

*Ltd. v. City of Alabaster,* 881 F.2d 1570 (11th Cir.1989), the Eleventh Circuit rejected the argument that town council members' consid-

Accordingly, Defendants' Motion for Summary Judgment is hereby **GRANTED** as to BFI's substantive due process claims.

### 3. Equal protection

 BFI alleges that Defendants' conduct in denying the applications discriminated between BFI and other similarly situated entities in violation of BFI's rights to equal protection under the Georgia and U.S. Constitutions.[16] Where, as here, no fundamental right or suspect class is involved, a plaintiff must show that (1) the plaintiff was treated differently from other similarly situated persons; and (2) the regulation is not rationally related to a legitimate government purpose. *Bannum, Inc. v. City of Fort Lauderdale*, 157 F.3d 819, 822 (11th Cir.1998). "Different treatment of dissimilarly situated persons does not violate the equal protection clause." *E & T Realty*, 830 F.2d at 1109. Moreover, "the rational basis inquiry is the same for equal protection and substantive due process challenges to zoning." *Bannum*, 157 F.3d at 822 n. 2 (quoting *Restigouche, Inc.*

*v. Town of Jupiter*, 59 F.3d 1208, 1214 n. 6 (11th Cir.1995)). Although the Court's conclusion above that Defendants' actions were rationally related to legitimate government purposes is dispositive of BFI's equal protection claim, the Court nevertheless evaluates the "similarly situated" portion of the equal protection standard.

### a. Was BFI similarly situated to Waste Management?

 BFI argues that Defendants treated BFI's rezoning application differently from that of Waste Management because they characterized the Live Oak Landfill as a nonconforming use and they failed to reaffirm Live Oak's compliance with zoning regulations prior to the issuance of Live Oak's vertical expansion permit. The Court concludes that BFI was not similarly situated to Waste Management at the time BFI applied for rezoning. A review of the process for obtaining a vertical expansion illuminates this conclusion.

eration of residents' general opposition to landowner's proposal created issues of fact with respect to a substantive due process claim:

> [N]othing is more common in zoning disputes than selfish opposition to zoning changes. The Constitution does not forbid government to yield to such opposition; it does not outlaw the characteristic operations of democratic ... government, operations which are permeated by pressure from special interests.... The fact that town officials are motivated by parochial views of local interests which work against plaintiffs' plan and which may contravene state subdivision laws ... does not state a claim of denial of substantive due process.

*Id.* at 1579 (quoting *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir.1988)) (internal quotations omitted). The record is replete with evidence that Defendants considered a wide variety of information in making their decision. Even if there could be disagreement whether the particular information used was the most state-of-the-art

or technically appropriate, it is clear that Defendants' decision was rationally based on numerous legitimate concerns. Nor does BFI point to any evidence showing personal animosity or other illegitimate motivations. *Id.* at 1579 n. 18. Indeed, BFI fails to distinguish any of the authority upon which Defendants rely or provide any alternative authority suggesting a different outcome.

16. BFI has not presented any independent argument or analysis regarding equal protection under the Georgia Constitution and is presumed to have abandoned it. Because the Georgia Constitution demands an analysis similar to that of the U.S. Constitution, however, the Court considers the following evaluation to apply to both claims. *See Georgia Dep't of Human Res. v. Sweat*, 580 S.E.2d at 211 ("The protections provided in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and in Article I, Section I, Paragraph II of the Georgia Constitution are construed to be consistent.").

The requirements for obtaining a vertical expansion of a landfill are set forth in Georgia Code section 12–8–24, *et seq.* First, the property must be properly zoned. O.C.G.A. § 12–8–24(g). Second, if the property is properly zoned, the applicant must obtain written verification that the proposed facility complies with local zoning or land use ordinances and is consistent with the local, multijurisdictional, or regional solid waste plan. *Id.* Finally, prior to granting permission for a modification, the State must hold a public hearing. *Id.* After these steps are completed, the State may issue a permit to grant an expansion of a landfill. *Id.*

With respect to determining whether a property is in conformance with zoning, the EPD provides the additional rule:

(a) Zoning. The site must conform to all local zoning/land use ordinances. Written verification must be submitted to the Division by the applicant demonstrating that the proposed site complies with local zoning and land use ordinances, if any. This verification shall include a letter from the local government authority stating that the proposed site complies with local zoning or land use ordinances, if any. This verification shall be provided at the time of submission of a permit application and reaffirmed by the governmental authority prior to permit issuance.

EPD Rule 391–3–4–.05(1)(a).

It is undisputed that BFI was required to apply for rezoning and obtain a SLUP before it could obtain a verification letter from the County and pursue a vertical expansion permit. Waste Management

was not so required because it applied for a permit before the 1999 Zoning Ordinance was enacted. These facts keep BFI and Waste Management from being similarly situated.

BFI emphasizes that after Defendants adopted the 1999 Zoning Ordinance, they did not reaffirm to the EPD that the site was properly zoned. BFI contends that this failure to reaffirm raises issues of fact. First, the Court notes that the EPD rule to which BFI cites does not impose any duty on a local government to issue a reaffirmation. Rather, reaffirmation appears to be a condition to obtaining a permit. There is no evidence that Defendants somehow wrongly caused Waste Management's permit to issue; if the permit was wrongly issued at all, EPD-not Defendants-was the entity responsible because it did not require the applicant to obtain a reaffirmation. Second, Waste Management applied for its expansion prior to the 1999 Zoning Ordinance, and because it was in compliance at the time of its application, it had a vested right to verification of that compliance, even at the time of reaffirmation. *See Banks County,* 444 S.E.2d at 786 ("Plaintiffs were in compliance with the County's zoning ordinances when they sought written verification of compliance on August 20, 1991. It follows that plaintiffs have a vested right to obtain written verification of zoning compliance despite the enactment of the September 26, 1991, zoning ordinance.") [17]

▮▮▮ In contrast to Waste Management, BFI seeks a rezoning subsequent to the enactment of the Ordinance in hopes of coming into compliance with local land use ordinances.[18] It is undisputed that BFI is

---

**17.** By emphasizing the "February 2 letter" and its notation that Live Oak landfill was a nonconforming use, BFI seems to argue that Waste Management should have been required to obtain a rezoning and SLUP before its permit was issued because the Zoning Ordinance went into effect prior to the permit's issuance. Yet BFI has presented no evidence

or legal argument to show that Defendants should have required Waste Management to apply for rezoning and a SLUP prior to obtaining its permit.

**18.** Thus, the two entities are further distinct in that Waste Management sought a written

not entitled to written verification until it obtains a rezoning and a SLUP. As the Eleventh Circuit has explained, "a local government does not violate the equal protection clause by granting a permit to an applicant who has a nonfrivolous claim of entitlement under the pertinent legislation and by denying a permit to another applicant who is clearly unentitled to it: the two applicants are not similarly situated." *E & T Realty,* 830 F.2d at 1111. In sum, because Waste Management in February 1999 was operating in an undisputedly different zoning landscape than BFI in 2001, the two entities are not similarly situated for purposes of BFI's equal protection claim; BFI has not presented evidence showing genuine issues of material fact as to this issue.

### b. Was BFI similarly situated to the County?

■■ BFI also argues that the County's landfill is similarly situated to BFI's landfill because the County is operating as a "competitor in the public domain." This argument overlooks the significant differences between privately and publicly operated landfills in Georgia. First, state law imposes upon the County an obligation to assure adequate solid waste handling for its citizens. O.C.G.A. § 12–8–31.1. No similar obligation is imposed upon BFI. Second, it is axiomatic that counties using property for governmental purposes are immune from their own zoning regulations.

*Macon Ass'n for Retarded Citizens v. Macon–Bibb County Planning & Zoning Comm'n,* 252 Ga. 484, 314 S.E.2d 218, 222 (1984); *City of Decatur v. DeKalb County,* 256 Ga.App. 46, 567 S.E.2d 376, 378 (2002); *Macon–Bibb County Hosp. Auth. v. Madison,* 204 Ga.App. 741, 420 S.E.2d 586, 587–88 (1992). BFI is not immune from these regulations.[19] Indeed, BFI makes no argument that the zoning immunity is violative of the equal protection clause, and the Court finds no authority in support of that proposition. The two are therefore not similarly situated as a matter of law; nor, as discussed above, do Defendants' actions fail the rational basis test.

Accordingly, Defendants' Motion for Summary Judgment is hereby **GRANTED** as to BFI's equal protection claims.

### 4. Dormant Commerce Clause

■■■■ In its Complaint, BFI alleges that "the denial of the Applications discriminates against interstate commerce and imposes a burden on interstate commerce that is clearly excessive in relation to the putative local benefits." (*E.g.,* Compl. ¶¶ 43, 51.) BFI thus argues that the Zoning Ordinance, as applied to its applications, violates the dormant Commerce Clause.[20] The Commerce Clause vests Congress with exclusive authority to regulate commerce among the states. *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). The Commerce Clause

verification from Defendants while BFI is seeking rezoning and a SLUP.

19. BFI argues that even if the government may be immune from zoning regulations, the County should be estopped from applying a higher standard to BFI's application than it applies to its own landfill. The doctrine of equitable estoppel is difficult to assert in this context because of the "forceful public reasons that militate against restricting the enforcement of [local] zoning ordinances." *Town of Union v. Strong,* 681 A.2d 14, 19

(Me.1996); *see State Soil & Water Conservation Comm'n v. Stricklett,* 252 Ga.App. 430, 555 S.E.2d 800, 805 (2001) (discussing principles). BFI points to no facts supporting equitable estoppel other than the bare existence of the zoning immunity; this showing is insufficient.

20. BFI does not allege that the Zoning Ordinance, or Defendants' Comprehensive Plan, facially violate the dormant Commerce Clause.

also has a dormant aspect that precludes state regulation of or discrimination against interstate commerce. *Welton v. Missouri,* 91 U.S. (1 Otto.) 275, 23 L.E. 347 (1875). Here, BFI's arguments implicate the dormant Commerce Clause. In evaluating a challenge on this basis, courts must first determine whether the law discriminates against interstate commerce or regulates evenhandedly with only incidental effects on interstate commerce. *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). If the law is in the former category, it is "virtually *per se* invalid." *Id.; Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). If the law is in the latter category, courts must apply the balancing test set forth in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The *Pike* balancing test requires courts to balance the purported benefits of the challenged regulation against its impact on interstate commerce and to determine whether the government could advance the interest equally well through means with a lesser impact on interstate commerce. *Id.* at 142, 90 S.Ct. 844. To pass constitutional muster, a regulation must operate "evenhandedly," result from a "legitimate local purpose," and have only an "incidental" impact on interstate commerce. *Id.* at 847. "For a state statute to run afoul of the *Pike* standard, the statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *Nat'l Elec. Mfrs.' Ass'n v. Sorrell,* 272 F.3d 104, 109 (2d Cir.2001). If an unequal burden is not shown, the court need not proceed further. *Id.*

Defendants argue that their decision (in denying the applications) has not placed a burden on interstate commerce different from that on intrastate commerce; under the *Pike* balancing test, there would thus be no constitutional violation. *See id.* Defendants further point out that in denying BFI's request to rezone, the Board did not place any conditions on where BFI could haul waste. Nor do Defendants restrict BFI or any private landfill operator from hauling waste inside or outside the state. As such, there is no record evidence that Defendants have imposed a burden on interstate commerce.

In response, BFI concedes that the *Pike* balancing test provides the applicable framework for these facts. However, BFI contends that it "will show at trial that the effect on interstate commerce is excessive in relation to the putative public benefits." (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 15.) BFI explains that the waste handled by private haulers will have to be routed to other jurisdictions because the County refuses to take out-of-state waste in its landfill or allow existing private solid waste disposal facilities to continue to operate in the County. Because the County landfill does not take out-of-state waste, Waste Management has "some additional life span," and BFI has only two to three years instead of eight as a result of not being able to vertically expand, BFI concludes that the Zoning Ordinance has the effect of eliminating landfill space that could receive out-of-county waste. BFI therefore argues that the Zoning Ordinance has the same effect as an outright ban on out-of-county waste. And although the unavailability of one landfill may not place a large burden on interstate commerce, BFI argues that if all Georgia counties adopted Zoning Ordinances like Defendants', the cumulative impact would be disastrous on industry. Finally, BFI states that Defendants could have achieved their legitimate objectives with a lesser impact on interstate activities, such as con-

ditioning vertical expansion on provisions that would improve the area.[21]

BFI relies on *Diamond Waste, Inc. v. Monroe County*, 939 F.2d 941 (11th Cir. 1991). In *Diamond Waste*, the defendant County passed a resolution to prevent the creation of a regional landfill and prevent waste from being transported into the County. *Id.* at 943. This resolution was passed as part of a plan to halt the plaintiff company from converting a dump within the County's borders to a regional landfill. *Id.* The court applied the *Pike* standard, reasoning that the resolution did not facially discriminate against interstate commerce because it treated interstate and intrastate waste on an equal basis. *Id.* at 944. Applying the balancing test, the court recognized that the county's environmental and land-use concerns were legitimate bases for passing the resolution. *Id.* Nevertheless, the court reasoned that these concerns were outweighed by the other *Pike* factors. The court pointed to evidence showing that the plaintiff had received inquiries about importing many tons of waste into the county as showing the impact on interstate commerce. *Id.* at 945–46. Most important to the court was the availability of less restrictive alternatives, such as limits on the amount of waste that could be landfilled on a daily basis. *Id.* at 946. In summary, the court stated, "under the particular circumstances at issue, the fact that less restrictive alternatives are available to [the county] makes the burden imposed by the absolute ban clearly excessive in relation to the local benefits created."

Although the principles expressed in *Diamond Waste* are relevant here, the case is distinguishable because the application of the Zoning Ordinance in this case did not involve an "absolute ban" on waste. It is undisputed that in denying BFI's applications, Defendants did not impose any requirements or conditions upon BFI as to how it operates and manages Hickory Ridge. Although BFI has chosen to re-route some waste to other facilities outside the County, it could just as easily have chosen to re-route more waste to Hickory Ridge. BFI has always known that Hickory Ridge would eventually reach capacity, and therefore Defendants' denial created no change in the status quo. This case is also distinguishable because BFI has not made the evidentiary showing that supported the *Diamond Waste* decision. BFI states that it will show at trial that the burdens on interstate commerce outweigh the local benefits, but Defendants' Motion for Summary Judgment requires BFI to make some showing now. BFI has failed to meet its burden of coming forward with evidence to show genuine issues of material fact.

The facts here make this case closer to *Clarkco Landfill Co. v. Clark County Solid Waste Management District*, 110 F.Supp.2d 627 (S.D.Ohio 1999). In *Clarkco*, the court granted a motion to dismiss the plaintiff's dormant Commerce Clause claim because the plaintiff had not alleged facts meeting the *Pike* balancing test. There, the plaintiff hoped to construct a landfill but anticipated that a local government authority would deny its siting application. *Id.* at 631. The plaintiff alleged that it had planned to accept waste from inside and outside the State of Ohio, and it argued that the defendant's prejudicial application of the siting review process would unduly burden interstate commerce. *Id.* After determining that the *Pike* balancing test governed, the court emphasized, "the

---

**21.** Although Defendants could have attached conditions to *rezoning*, the Court finds no support for the argument that Defendants-as opposed, for example, to the State-could place conditions on the vertical expansion.

minimum showing required to succeed in a Commerce Clause challenge to a state regulation is that it have a disparate impact on interstate commerce. The fact that it may otherwise affect commerce is not sufficient." *Id.* at 640. Although the plaintiff alleged that it planned to accept waste from outside of the state in its landfill, the court noted that there were no allegations that the defendants would block the landfill with the purpose of preventing out-of-state waste from entering that landfill; rather, the action would prevent *all* waste from entering that landfill. *Id.* Thus, although the action affected commerce, it could not be said to unduly burden interstate commerce. *Id.*

Similarly here, it is undisputed that Hickory Ridge takes waste from within and without the County's borders and has not been prohibited from continuing to do so. It is also undisputed that Live Oak is available to take waste from within and without the County. Like the plaintiff in *Clarkco Landfill,* BFI may eventually be unable to take *any* waste from *anywhere* at Hickory Ridge; this result may have a commercial impact, but it does not create an excessive burden on interstate commerce. Although BFI argues that eventually the private landfills will close and there will be no place in the County to landfill municipal solid waste from outside the County, that scenario does not represent the current circumstances and is not ripe for review. It may be, for example, that another landfill in the County becomes able to accept municipal solid waste, or even that BFI submits another rezoning application in the future that will be granted. *See* DeKalb County Code of Ordinances § 27–844 (successive applications for amendments may be made after twenty-four months or earlier if allowed by board of commissioners); *id.* § 27–876 (same for SLUP applications).

Based on the foregoing, the Court **GRANTS** Defendants' Motion to Dismiss as to BFI's Commerce Clause claims.

## B. Sherman Act

In Count IV, BFI claims that Defendants' actions were taken "pursuant to a conspiracy to monopolize and attempt to monopolize the municipal solid waste market in the DeKalb County region." (Compl. Count IV ¶ 58.) Defendants contend that the County is shielded from Sherman Act claims because it enjoys state action immunity. The U.S. Supreme Court developed state action immunity in *Parker v. Brown,* 317 U.S. 341, 352, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker,* the Court held that the Sherman Act does not apply to states' anticompetitive conduct when those states act as sovereigns. *Id.* "[T]o enjoy immunity from federal antitrust liability, the [local government] must establish that (1) the state has generally authorized the [local government] to perform the challenged action, and (2) the 'suppression of competition is the foreseeable result of what the statute authorizes.'" *McCallum v. City of Athens,* 976 F.2d 649, 652 (11th Cir.1992) (quoting *City of Columbia v. Omni Outdoor Adver., Inc.,* 499 U.S. 365, 373, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991)).

Here, the Georgia Constitution authorizes DeKalb County to provide "[g]arbage and solid waste collection and disposal." Ga. Const. art IX, § 2, ¶ 3(a)(2). The Georgia Comprehensive Solid Waste Management Act ("GCSWMA") enables solid waste management authorities, such as that of DeKalb County, to enter into agreements "for an exclusive right or rights in any authority with respect to such solid waste, including, but not limited to, the exclusive right to collect, acquire, ... or dispose of discarded solid waste." O.C.G.A. § 12–8–51(b). The exercise of

this power is done "pursuant to state policy." *Id.* § 36–65–1. Further, the Georgia legislature has expressed its intent "clearly" and "affirmatively" "that in the exercise of such powers, such local governing authorities shall be immune from antitrust liability to the same degree and extent as enjoyed by the State of Georgia." *Id.* § 36–65–2. These provisions evidence "Georgia's express contemplation of municipal anticompetitive conduct." *McCallum,* 976 F.2d at 655. Local governments acting pursuant to the GCSWMA "are shielded from federal antitrust liability." *James Emory, Inc.,* 883 F.Supp. 1546, 1564.

BFI does not contest these conclusions. However, BFI relies on *Pine Ridge Recycling v. Butts County,* 855 F.Supp. 1264 (M.D.Ga.1994), for the proposition that "Georgia cannot grant its local governments the authority to violate the Commerce Clause." *Id.* at 1271. In *Pine Ridge,* the court denied the defendant county's motion to dismiss the plaintiff's antitrust claim, reasoning that notwithstanding the statutes set forth above, the antitrust claim should survive because the plaintiff's dormant Commerce Clause claim was not due to be dismissed. *Id.* at 1271. As BFI candidly admits, this portion of *Pine Ridge* was limited in *James Emory, Inc.,* 883 F.Supp. 1546. In *James Emory, Inc.,* the court emphasized that "[w]hether a state's action has invaded the province of the dormant Commerce Clause, and whether that same action violates the Sherman Act, are separate and distinct inquiries." *Id.* at 1562. The Court agrees with the reasoning in *James Emory.* The Sherman Act-passed by Congress-and Commerce Clause-established in the Constitution-have different pedigrees and require different analyses. *See also Car-*

*bone, Inc. v. Clarkstown,* 511 U.S. 383, 424, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (Souter, J., dissenting) ("the monopolistic character of [a local ordinance's] effects is not itself suspicious for purposes of the Commerce Clause"). Here, BFI's Sherman Act claim is foreclosed by state action immunity; the Court considers its dormant Commerce Clause claim separately.[22] Accordingly, Defendants' Motion for Summary Judgment is hereby **GRANTED** as to BFI's Sherman Act claims.

## C. Immunities

Defendant County Commissioners contend that they are entitled to the following immunities: (1) legislative immunity; (2) qualified immunity; and (3) official immunity. BFI responds that it seeks relief from Defendant County Commissioners only in their official capacities. (*See* Pl.'s Opp'n Br. at 32–34.) Thus, the Court does not address legislative, qualified, or official immunity. *See Bd. of County Comm'rs v. Umbehr,* 518 U.S. 668, 677 n. *, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1995) (legislative immunity from suits under § 1983 extends to public servants only in their individual capacities); *Heggs v. Grant,* 73 F.3d 317, 319 n. 5 (11th Cir.1996) (same for qualified immunity); *Norris v. Emanuel County,* 254 Ga.App. 114, 561 S.E.2d 240, 242–43 (2002) (official immunity extends to government officials and employees sued in their individual capacities).

All Defendants-the County Commissioners in their official capacities and the County-contend they are entitled to sovereign immunity as to the state-law claims. *See* Ga. Const. art. I, § 2, ¶ 9(e). This argument overlooks the types of relief sought by BFI. Georgia courts recognize an exception to sovereign immunity where

---

**22.** Even if the Court were to follow the *Pine Ridge* analysis, BFI's Sherman Act claim would fail under its reasoning because BFI's dormant Commerce Clause claims cannot survive summary judgment. *See supra* Part III.A.4.

a plaintiff seeks injunctive relief against the state or a public official. *Int'l Bus. Machines Corp. v. Evans,* 265 Ga. 215, 453 S.E.2d 706, 708 (1995); *see Olley Valley Estates, Inc. v. Fussell,* 232 Ga. 779, 208 S.E.2d 801, 805 (1974) ("an injunction may be sought in a court of equity in an action which is brought against the governing officials of the county"). Here, BFI seeks injunctive and declaratory relief, not money damages. Moreover, Defendants do not reply to BFI's argument that mandamus is available despite any sovereign immunity, and the Court finds no authority to the contrary. *See generally Oglethorpe Dev. Group, Inc. v. Coleman,* 271 Ga. 173, 516 S.E.2d 531 (1999) (evaluating mandamus and damages claims separately where damages claims were barred by official immunity); *Aiken v. Armistead,* 186 Ga. 368, 198 S.E. 237, 247 (1938) (suggesting that mandamus and injunctive relief are exceptions to sovereign immunity). Accordingly, to the extent that BFI seeks prospective relief and mandamus, the state-law claims against Defendants are not barred by sovereign immunity.[23]

### Conclusion

The Court hereby **DENIES** Defendants' Motion to Strike the Written Report of Plaintiff's Engineer [38–1]. The Clerk is **DIRECTED** to remand BFI's claims of takings under the Georgia and U.S. Constitutions, and inverse condemnation, to the Superior Court of DeKalb County, Georgia. The Clerk is **DIRECTED** not to close this case until further Order of this Court. The parties are **ORDERED** to submit a status report to this Court within six months of the date of entry of this Order. Defendants' Motion for Summary

Judgment [26–1] is hereby **GRANTED** as to all claims except for those being remanded.

---

23. The parties do not argue whether a writ of mandamus is an available remedy in this case; given the Court's disposition of the remaining claims, that issue is moot. *See generally Lindsey v. Guhl,* 237 Ga. 567, 229 S.E.2d 354, 357 (1976) (no writ of mandamus available in action against DeKalb County arising out of decision to site landfill in southern portion of county where plaintiff could not show "a legal duty the performance of which [was] required").